IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**Bass Management, Inc.**

**v**

**United States of America**

**No. 07-56 C**

---

# AMENDED COMPLAINT

Bass Management, Inc. complains against the United States of America, acting through the Secretary of the Army (Corps of Engineers, Vicksburg District) for Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Breach of Implied Duty of Cooperation, Breach of Federal Regulations that mandate government officials to foster competition and treat contractors fairly and equitably and for Injunctive Relief as follows:

## I. NATURE OF ACTION

1. This is a civil action for breach of contract and other relief pursuant to the Tucker Act, 28 U.S.C. §1491, the Contract Dispute Act, 41 U.S.C. §601-613 and the Dispute Clause provision of the commercial concession lease agreement between the parties.

2. This action is a timely appeal of the deemed final decision of the Contracting Officer where he indefinitely suspend responding to Plaintiff's request for relief.

## II. PARTIES

3. The Plaintiff, Bass Management, Inc. ("Bass"), is an Arkansas corporation qualified to do business and doing business in the State of Arkansas. Bass operates a commercial recreation concession at Lake Ouachita, Garland County, Arkansas ("Lake Ouachita"). Mr. Benton N. "Ned" Bass is the President of Bass ("Ned Bass").



JO.99348399.3

4. The Defendant is the United States of America acting through the Secretary of Army, Corps of Engineers ("Corps"). At all relevant times, Mr. Burke S. Torrey ("Torrey"), Chief of Real Estate Division, Vicksburg District, Corps of Engineers, Department of the Army was the Contracting Officer ("CO") for the Bass commercial concession on Lake Ouachita.

## III. JURISDICTION

5. This Court has original jurisdiction pursuant to the Contract Dispute Act, 41 U.S.C. §§601-613 and the Tucker Act, 28 U.S.C. §1491.

6. The case is properly filed pursuant to the contract Dispute Clause found in Paragraph 32 of the Lease Agreement between Bass and the Corps. A true and correct copy of the Lease Agreement is attached as Exhibit "A". (All exhibits are incorporated by reference into the Complaint.)

## IV. DENIAL OF RELIEF

7. By letter dated July 6, 2006, Ned Bass acting as President of Bass submitted a demand to the CO for return of excess rent and for other relief. The demand sought return of $122,009 plus interest. Ned Bass certified to the accuracy of the demand. A true and correct copy of the demand and certification are attached as Exhibit "B".

8. By letter dated August 28, 2006, the CO said that the Corps was too busy to respond within sixty (60) days. The CO promised to respond by December 18, 2006. A true and correct copy of the letter is attached as Exhibit "C".

9. At the time of the CO's letter, a criminal investigation of Bass was pending in the U. S. Attorney's office in the Southern District of Mississippi.

10. In response to Bass' inquiry about the need for extra time, the CO reiterated that the Corps would respond by December 18, 2006. A true and correct copy of the September

5, 2006 letter is attached as Exhibit "D".

11. In September 2006, the U. S. Attorney's Office for the Southern District of Mississippi closed the criminal investigation.

12. By letter dated October 2, 2006, Bass requested the CO to provide a recommendation needed to pursue a business opportunity involving a marina on the Arkansas River. Bass also requested the CO issue an Estoppel Certificate in order for Bass to reopen negotiations for the purchase of the Swaha Lodge commercial concession on Lake Greeson. A true and correct copy of the letter is attached as Exhibit "E".

13. By letter dated October 5, 2006, the CO denied the request because there was an "active dispute [with Bass]...over the alleged under-reporting of gross receipts." A true and correct copy of the letter is attached as Exhibit "F."

14. On November 9, 2006, the CO informed Bass that "circumstances have changed since the matter is still pending with the criminal investigation." The CO said as long as "allegations of fraud remain" the Corps would not respond. The CO suspended his response indefinitely. A copy of the letter is attached as Exhibit "G".

15. At the time the November 9, 2006 letter was written, the only relevant change in circumstances was that the U.S. Attorney's office closed the criminal investigation and returned business records the grand jury subpoenaed from Bass.

16. The CO's indefinite suspension of a response is unreasonable. The CO's letter constitutes a final decision denying the relief sought by Bass.

## V. BACKGROUND

17. In 1986 the lease for the Brady Mountain Resort commercial concession at Lake Ouachita ("Brady Mountain") was assigned to Bass. At the time, Bass was owned and operated by Ned Bass.

18. The lease provided for monthly payment of rent. Rent was based primarily upon a declining percentage of the " gross income of lessee from business operations conducted under the lease." The lease defined, " 'Gross Income' as used herein means the total receipts of the lessee from the business operations conducted under this lease...."

19. As explained to Ned Bass, "Gross Income" and "total receipts of lessee" were the same as Bass' gross sales from its operations within the concession. (Bass had other business outside the concession.)

20. The rent structure was: 3% of the first $5000 of gross income, 2% of the next $5000 and 1% of all amounts over $10,000. The lease also specified an additional $100 per annum rental payment.

21. The Corps provided a pre-printed form to Bass for reporting its gross income. The form used the term "Gross Receipts" to delineate the line for gross income. Attached as Exhibit "H" is a true and correct copy of the Corps' form.

22. In 1993, Bass entered into a sublease with Donald Hill d/b/a Hill's Lake Escapes, Inc. ("Hill's") which was assigned to Hill's. The sublease was approved by the Corps.

23. Hill's rented house boats to the public. Hill's moored its house boats in slips at Brady Mountain. The sublease provided for Hill's to pay an annual fixed rate rent for dock space from Bass.

24. Hill's rental payment was included in the Gross receipts Bass reported to the Corps for the month in which the rent was received.

25. Bass had no ownership or other financial interest in Hill's. Bass exercised no control over Hill's. Bass' relationship with Hill's was contractual.

## VI. 1996 LEASE AGREEMENT

26. When Bass requested additional land to expand Brady Mountain, the Corps

conditioned its approval on signing a new lease. The Corps prepared a new lease and presented it to Bass. Bass agreed to the new Lease Agreement. The new Lease Agreement was effective January 1, 1996.

27. At the time the new Lease Agreement became effective, nine (9) years and two (2) months remained on the term of the old lease.

28. Unlike the old lease, the new Lease Agreement contained a Revised Graduated Rental System. The graduated rental system starts with a rate of 2.0% of gross receipts of $50,000 or less with an increasing percentage as revenue increased. Generally, for every $200,000 increase in revenue, the rental rate percentage increased 1/10th of a percent (.1%).

29. The Lease Agreement provides that the rental percentage rate is based on "total gross receipts for each rental payment period." Paragraph 2a.(1) of the Lease Agreement (Exhibit A) provides that "Gross receipts are defined as the total of the concessionaire's receipts from business operations conducted on the premises, including receipts of sublessees and licensees."

30. Bass was "the concessionaire." "[C]oncessionaire's receipts" meant Bass' receipts. "[T]he total of concessionaire's receipts" meant Bass' gross receipts. In this context, gross receipts was the same as Bass' gross income from business operations within the concession.

31. "The total of the concessionaire's receipts" does not include sublessees gross income. Bass never received, controlled or possessed the gross income of its sublessees at Brady Mountain.

32. The receipts of sublessees paid to Bass as rent were included in the gross receipts reported by Bass to the Corps and used in calculating rent.

33. The Lease Agreement was executed by Torrey, as the CO. Torrey sent the Lease

Agreement to Bass by a letter dated December 20, 1995. A true and correct copy of that letter is attached as Exhibit "I".

34. In the letter, Torrey instructed, "Your [Bass'] monthly rent will be 2.3 percent of your [Bass'] total sales…." "[Y]our total sales" meant the gross income Bass received from its operations within the concession.

35. Upon information and belief, the 2.3 percent was based solely on Bass' gross income for the prior period. The Corps did not use any sublessee's gross income in determining the 2.3 percent.

36. At the time the Lease Agreement was signed, Bass received rent from Hill's. The receipts of Hill's paid to Bass as rent were included in Bass' gross receipts reported to the Corps.

37. As noted, the Corps had approved Bass' sublease with Hill's. The Corps had a copy of the sublease when it drafted the new Lease Agreement. The Corps knew Bass' sublease with Hill's did not require Hill's to report its gross income to Bass.

38. At the time the Lease Agreement became effective, no one from the Corps told Bass to start adding Hill's gross income to the gross receipts Bass reported to the Corps.

39. At the time the Lease Agreement became effective, the Corps intended for Bass to report its gross income to the Corps as "Gross receipts." The Corps knew Bass would calculate rent based only on Bass' gross income from its operations within Brady Mountain.

40. In 1998, Bass entered into a new long term sublease with Hill's. The new sublease was reviewed and approved by the Corps.

41. The new sublease provided for Hill's to pay $2000.00 per annum for a floating office and $1,000.00 per annum for each boat slip rented from Bass. The new sublease did not specifically require Hill's to regularly report its gross income to either the Corps or to

Bass.

42. The new sublease with Hill's would have been financially imprudent and cost Bass money if the Corps had been requiring Bass to include Hill's gross income in its Gross receipts reported to the Corps and in calculating monthly rental payments to the Corps. In short, under such a scenario, Bass would have lost money on the Hill's sublease.

43. At the time the new sublease with Hill's was signed, Bass reasonably believed it was to report and pay rent to the Corps based only on its gross income. Bass belief was based on the Corps representation, approval of Hill's sublease, the correct interpretation of the "Gross receipts" and its practice under the Lease Agreement.

44. The Corps knew Bass was not including Hill's gross income in Bass' report of Gross receipts and in calculating monthly rent payments.

45. Prior to 2003, Bass entered into additional subleases with other businesses. Each sublease was reviewed and approved by the Corps.

46. Bass had no ownership or other financial interest in any of these sublessees. Each sublessee was a separate, independent entity. As with Hill's, Bass only included rent it received under the various sublessees as part of the Gross receipts reported to the Corps.

## VII. 2003: CORPS IMPOSED CHANGE

47. In early 2003, the Corps arbitrarily and unilaterally imposed a new requirement that Bass start including sublessee gross income in Bass' "Gross Receipts" reported to the Corps. The CO, through a representative of his office, verbally instructed Bass to make this change.

48. Apparently the change was imposed in order to deflect criticism of the Corps' Vicksburg District by an internal audit. The change was also imposed to increase the Corps income from Brady Mountain concession.

49. Upon information and belief, at the same time the CO, through a representative of his office, instructed Bass' sublessees to start paying rent to the Corps based on a percentage of their gross income. The Corps directed these increased payments be passed through Bass.

50. These changes were imposed by the Corps through its superior position and accompanying supervisory power to, among other things, impose substantial hardship and burdens on Bass and its sublessees if they failed to comply.

51. The Lease Agreement requires amendments to the lease be in writing. Bass requested the Corps to put this unilaterally imposed requirement in writing. The Corps refused to do so.

52. At the time the change was imposed, the Corps did not state Bass was out of compliance with the Lease Agreement. The Corps never gave written notification to Bass that from 1996 through 2002 it was out of compliance with the Lease Agreement for under reporting gross receipts.

53. By verbally imposing the change and failing to commit the change and bases for it in writing, the Corps circumvented the terms and conditions of the Lease Agreement.

54. Since the Corps has imposed the change, Bass has added what it reasonably believes to be the sublessees' gross income to the Gross receipts number reported to the Corps and in calculating rental payment. This caused and continues to cause Bass to pay more rent than is owed under the Lease Agreement.

55. In addition, the arbitrary change strained Bass relationship with its sublessees, especially Hill's. Generally, the subleases lacked any specific provision that required the sublessee to pay rent based upon percentage of gross income that mirrors the percentage the Corps' new requirement imposed on Bass.

56. The Corps' action was arbitrary and capricious. The change was imposed with

deliberate and gross indifference to the injury caused to Bass. In directing the change the Corps was motivated by improper purpose so as to constitute bad faith.

## VIII. THE AUDIT

57. In early 2003, the CO informed Bass that the operations of the concessionaires at Lake Ouachita were going to be audited. Bass was singled out for the first audit.

58. In the spring of 2003, an auditor with the Defense Contract Audit Agency ("DCAA") met with Ned Bass. In August 2003 the DCAA auditor meet with Bass' outside CPA. The primary, if not only, purpose was to confirm that Bass had not included the sublessees' gross income in its reports of Gross receipts to the Corps during the years 1999 through 2002.

59. The auditor did not undertake any systematic review of Bass' financial and records made available to them. For more than three (3) years, the DCAA auditors made no request for additional information.

60. Upon information and belief, contrary to the CO's representation, no other concessionaire at Lake Ouachita has been audited by DCAA.

## IX. OCTOBER 2003 ESTOPPEL CERTIFICATE

61. In the fall of 2003, Bass wanted to improve its existing facilities at Brady Mountain. To finance this improvement, Bass applied for a bank loan of approximately $1,000,000. The loan process required confirmation from the Corps that Bass was in compliance with the Lease Agreement.

62. As an inducement, in October 2003 the CO executed an Estoppel Certificate that certified Bass was "…not in default as to any term or condition of said [Lease Agreement]…." A true and correct copy is attached as Exhibit "J".

63. The bank relied on the Estoppel Certificate in making the loan. Bass reasonably

relied on the Estoppel Certificate in undertaking the loan obligation and using the loan funds to improve its facilities at Brady Mountain.

64. The improvements benefit the Corps and enhanced the recreation opportunities for the public at Lake Ouachita.

**X. VINDICTIVENESS**

65. Beginning in late 2003, Bass sought approval of its purchase of the Swaha Lodge commercial concession at Lake Greeson, Arkansas. The Corps initially blocked the purchase because of an "ongoing audit" of Brady Mountain.

66. There was no ongoing audit of Brady Mountain. The Corps used the "audit" as a pretext to block Bass' purchase of the Swaha Lodge.

67. In response to the support of Bass' effort to gain approval of its purchase the Swaha Lodge concession by a distinguished member of Congress, the Corps undertook a course of conduct of intimidation and oppression of Bass.

68. The Corps initiated and caused to be initiated a criminal investigation of Bass. This enabled the Corps to retaliate against Bass by informing the Congressman that Ned Bass and Bass were the target of a criminal investigation.

69. The Corps used its unilaterally imposed verbal change to the Lease Agreement as a devise to cause the federal "grand jury criminal investigation." The Corps acted as if its arbitrarily imposed change was the proper. The Corps accused Bass and Ned Bass of wrongfully and intentionally under reporting Gross receipts by failing to include sublessee gross income as part of Gross receipts reported to the Corps and in calculating rent.

70. In making the accusation, upon information and belief the Corps willfully and deliberately, or with such gross indifference as to constitute bad faith, omitted and suppressed material facts including the Corps' intent that Bass only pay rent on its "gross sales" and that

as of October 2003 Bass was not in default on any term and condition of the Lease Agreement.

71. The Corps ulterior motive in making accusations against Bass and Ned Bass was not to protect public welfare but to retaliate against and punish Bass and Ned Bass.

## XI. COURSE OF CONDUCT OF INTIMIDATION AND OPPRESSION

72. Beginning in 2004, the Corps intensified its conduct designed to oppress, intimidate and harass Bass and Ned Bass. The course of conduct also benefited a favored concessionaire that was a competitor of Bass at Lake Ouachita.

73. As noted, the Corps used the pretextual "audit" to block Bass' entry into Lake Greeson. Then after initiating the criminal investigation, the Corps relied on the investigation to block Bass' purchase of the Swaha Lodge concession.

74. The criminal investigation adversely impacted Bass' ability to compete by diverting time, energy and financial resources of Bass to deal with the investigation. The investigation also effectively prohibited Bass from seeking additional financing to improve and expand its Brady Mountain operation.

75. By causing the criminal investigation, the Corps forced Bass to defend its practice under the lease and its interpretation of "Gross receipts" language in a venue not contemplated by the Lease Agreement.

76. To further intimidate and oppress Bass, the Corps initiated and caused to be initiated a debarment proceeding. Through the debarment proceeding, the Corps sought to accomplish its goal to eliminate Bass from any future contracting with the Corps.

77. As it did with the criminal investigation, the Corps used its 2003 arbitrarily imposed change to the Lease Agreement to trump-up accusation that Bass wrongfully under-reported its Gross receipts from 1999 through 2002.

78. Bass timely responded to a debarment show cause letter. To date, no reply to the response or other action has been taken by the debarment authority. Thus the debarment show cause remains as a impediment to Bass' ability to seek financing and to expand.

79. By initiating the debarment proceeding, the Corps has forced Bass to defend its practice under the Lease Agreement and its interpretation of "Gross receipts" in another venue not contemplated by the Lease Agreement.

80. To facilitate this bad faith, malicious course of conduct the Corps knowingly passed off as worthy of belief the fallacious accusation that Bass intentionally and wrongfully under-reported Gross receipts from 1999 through 2002.

81. Bass was set up for this accusation in early 2003 when the Corps without right or authority verbally required Bass to start adding its sublessees' gross income into the Gross receipts reported to the Corps.

82. The Corps strong armed this change with the knowledge that Bass had been properly and in good faith reporting Gross receipts to the Corps.

83. As part of this course of oppression and harassment of Bass, in 2005 the Corps turned off the water supply to Brady Mountain. Water had been supplied to the concession for thirty (30) years.

84. In or around August 2006, the U.S. Attorney's Office for the Southern District of Mississippi decided to close its criminal investigation (and the grand jury investigation) of Bass without taking any action.

85. On or around September 2006, an agent with Department of Defense, Criminal Investigative Division (CID) informed Bass' local counsel that the criminal investigation was closed. As contemplated by the agent, Bass' counsel informed Bass the investigation had been closed. Attached as Exhibit "K" is the true and correct copy of counsel's letter

confirming this for Bass.

86. In his November 7, 2006 letter, the CO states there is a "criminal investigation" that involves "allegations of fraud" to justify his suspension of a reply At the time, the CO and the Corps knew the U. S. Attorney's office had closed the criminal investigation.

87. In November 2006, the Corps and the CO knew that other than their own accusation of fraud against Bass there was no such independent finding or adjudication.

88. The CO's indefinite suspension of a response was an abuse of the contract dispute provisions in the Lease Agreement and done in bad faith.

89. The indefinite suspension was calculated to financially punish Bass since the Lease Agreement requires Bass to continue payment of excess rent. The indefinite delay also exacerbated the tension between Bass and its sublessees.

90. The indefinite suspension and languishing debarment proceeding also oppresses Bass by preventing its seeking financing for expansion and by inhibiting Bass' ability to compete.

91. In late September 2006 the CID agent sought certain limited information on restaurant receipts to complete the "audit" of Bass. Even though the Corps had the information, Bass complied with the request.

92. The "audit" is a pretext. It is no more than a thinly veiled, desperate effort to find some justification for the mean spirited treatment of Bass and Ned Bass by the Corps.

93. In October 2006, Bass needed a recommendation from the Corps in order to close a business deal involving a marina. The Corps justified its refusal to cooperate with Bass because of a dispute over "under reporting of Gross receipts." As a direct foreseeable result of the Corps refusal to cooperate, Bass was unable to close the deal.

94. In addition in 2006 for the first time, the Corps began to require Bass to provide

professional certifications of compliance with certain lease provisions, such as fire code and disability access. The Corps singled out of Brady Mountain in order to harass Bass and increase its operational expenses.

95. In 2006, the Corps engaged in direct communications with Hill's about its sublease with Bass. The Corps excluded Bass from these communications. The Corps intentionally undermined Bass by inferring the Corps 2003 verbal instruction to Hill's to pay rent based on its gross income did not occur and certainly no longer applied to Hill's.

96. The Corps instructed Hill's to continue to report its gross receipts to the Corps but encouraged Hill's to stop paying rent base on a percentage of gross income. These communications were intended to damage Bass by promoting conflict between Hill's and Bass.

97. The Corps also intended for the communications with Hill's to cause additional financial hardship to Bass. The Corps endeavored to put Bass in a position where Bass had to pay substantially more rent to the Corps on Hill's operation than Bass received from Hill's. In short, the Corps sought to cause Bass to lose money on the sublease.

98. The Corps officials have a personal animus toward Bass and Ned Bass. The Corps has pursued this course of conduct and abuse of official position in bad faith and with malice toward Bass. The course of conduct is specifically intended to financially oppress Bass and to ultimately eliminate Bass as a governmental contractor.

## XII. FAVORITISM TO A PREFERRED CONCESSIONAIRE

99. At Lake Ouachita, the Corps gives unfair preferential treatment to the concessionaire Mountain Lake, Inc. ("Mountain"). The Corps' favoritism is contrary to its obligations under the Federal Acquisition Regulations system (FAR) that requires the CO and Corps to promote competition and to conduct the Corps business with integrity and fairness.

See e.g. 48 CFR §1.102; 48CFR §1.602-2(b).

100. The Corps preferential treatment is exemplified by allowing Mountain to expand its operations on rental terms substantially more favorable than those required of Bass when it expanded. The Corps gave Mountain more acreage for expansion than Bass while allowing Mountain to keep the decreasing percentage rental rate structure. Mountain pocketed substantial extra profits because the Corps did not require the use of the revised Graduated Rental System.

101. The Corps provides free sewer service to Mountain at Lake Ouachita and elsewhere. The Corps never offered free sewer service to Bass. In 2006, Bass requested the Corps to provide comparable free sewer service. The Corps refused to.

102. As discussed above, as part of its oppressive course of conduct, the Corps unfairly blocked Bass from purchasing the Swaha Lodge concession at Lake Greeson, Arkansas. This benefited Mountain and its owner who also operated a concession at Lake Greeson by protecting them from competition by Bass.

103. The CO has required Bass provide certain professional certifications of compliance. This requirement was not part of the routine yearly compliance inspection. Upon information and belief, the Corps has not required Mountain to provide similar certifications.

## XIII. COUNT 1: BREACH OF CONTRACT

104. Paragraphs 1 through 103 are incorporated by reference into this Count 1.

105. In January 2003, the Corps arbitrarily and capriciously imposed the requirement that Bass start adding its sublessees' gross income into the amount of Gross receipts reported to the Corps and in calculation of monthly rent payable to the Corps.

106. To the best of its ability, Bass complied with this verbally imposed change.

107. The Corps action was contrary to the clear meaning of "Gross receipts" set out in

the Lease Agreement, was contrary to the intent of the parties at the time of the Lease Agreement became effective, and was contrary to the practice both before and after the Lease Agreement became effective.

108. By verbally and unilaterally changing the Lease Agreement payment terms, the Corps breached and continues to breach the Lease Agreement.

109. The breach was without right or authority. The breach was in bad faith since it was motivated to avoid criticism of Corps officials and to increase the Corps profits by extracting excess rent from Bass.

110. As a direct result of the Corps' breach, in January 2003 Bass began to pay more rent than was owed. Bass continues to pay more rent than is due.

111. As a consequence, Bass is entitled to recover all excess rent paid to the Corps since January 2003 plus interest.

## XIV. COUNT II: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND DUTY OF COOPERATION

112. Paragraphs 1 through 111 are incorporated by reference into this Count II.

113. The Lease Agreement includes an implied covenant of good faith and fair dealing and implied duty of cooperation.

114. In 2003 the Corps verbally imposed the requirement that Bass start adding its sublessees' gross income to the Gross receipts report to the Corps. As stated, this arbitrary change was contrary to the correct interpretation of the Lease Agreement, the intent of the parties at the time the lease was signed and the practice at that time.

115. The Corps refused to put this required change in writing. The Corps verbally imposed the change in order to deflect criticism from the CO and other officials by an internal audit and in order to increase the Corps profits from the Brady Mountain concession.

116. In verbally imposing the change, the Corps deliberately and intentionally

circumvented the lease provisions for amending the lease. In the alternative, the Corps deliberately failed to follow the lease provision for dealing with a non-compliance.

117. After verbally imposing the change on Bass, the Corps began to use the change as bases for asserting that Bass intentionally and wrongfully under-reported Gross receipts prior to 2003.

118. The Corps knew and reasonably should have known that prior to 2003, Bass had not included its sublessees gross income in the Gross receipts reported to the Corps because the lease did not require sublessee gross income be included and at the time the lease was signed the Corps did not intend for the sublessee gross income to be included.

119. In addition the Corps knew and reasonably should have known that prior to 2003 Bass did not include its sublessees in gross income in the Gross receipts reported to the Corps because Bass reasonably believed sublessee gross income was not required to be included in its reports of Gross receipts and that Bass reported its Gross receipts with the good faith belief it was correctly interpreting the lease and the Corps intent.

120. Accordingly, when the Corps asserted and caused to be asserted that Bass was engaged in fraud; that Bass knowingly under-reported its Gross receipts; that Bass acted with criminal intent or suspected criminal intent by under reporting its Gross receipts; that Bass continues to be subject to a criminal investigation involving allegation of fraud and made similar accusations against Bass and Ned Bass, the Corps breached the duties of good faith and fair dealing and of cooperation owed to Bass under the Lease Agreement.

121. In making and communicating accusation that Bass and Ned Bass under-reported its Gross receipts to criminal investigators, to the U.S. Attorney's office, to a federal grand jury, to debarment officials and to others, the Corps intentionally and purposely or, in the alternative, with deliberate and gross indifference, suppressed and omitted material facts

including the Corps original intent, as exemplified by Exhibit "H", and the Corps October 2003 certification that Bass was in full compliance all terms of the Lease Agreement. The suppression and omissions of material facts was motivated by a malicious and bad faith purpose to trump up the accusations against Bass and to frame Bass as a wrongful actor. These acts of suppression and omission of material facts constitute breaches of the duties of good faith and fair dealing and of cooperation the Corps owed to Bass under the Lease Agreement.

122. To accomplish its goal to oppress and to eliminate Bass, the Corps exploited its unilateral power to dictate changes to the lease and its superior administrative position as a governmental lessor by the following (among others): unilaterally impose a verbal change in the lease terms; arbitrarily refusing to follow the lease provisions; refusing to provide services and terminating other services at the concession site; arbitrarily and capaciously asserting Bass knowingly and wrongfully under-reported Gross receipts; arbitrarily and capaciously blocking Bass' purchase of a concession, refusing Bass' request for a positive recommendation and request for an Estoppel certificate; and intentionally misstating and suppressing material facts in order to facilitate the intimidation and oppression of Bass and force Bass to respond to a criminal investigation and debarment proceeding that circumvent the protections in the Lease Agreement; and abusing the contract dispute process.

123. Beginning sometime in 2003 and continuing to the present, the Corps has engaged in the course of intimidation and oppression set out above with a specific intent to retaliate against Bass with the ultimate goal of eliminating Bass as a Government contractor.

124. The Corps acted in bad faith in order to unfairly increase Corps income from the Brady Mountain concession.

125. Through the above described course of conduct, acts and omissions, the Corps

has breached the duties of good faith and fair dealing and of cooperation owed to Bass under the Lease Agreement.

126. As a direct foreseeable consequence of these breaches of duty, Bass was prevented from purchasing the Swaha Lodge concession at Lake Gleeson, being awarded a marina operation and expanding Brady Mountain through loans at favorable interest rates.

127. As a direct foreseeable consequence of the Corps breach of these duties, Bass incurred substantial expenses including professional fees and expenses in responding to the criminal investigation and debarment proceeding.

128. As a direct foreseeable result of the course of conduct and acts and resulting breaches of these duties, Bass has suffered damages including, but not limited to, loss of business opportunity, loss of opportunity for favorable financing, loss of profits, professional (lawyer and accountant) fees and cost, professional expenses and increased operational expense.

## XV. COUNT III: ESTOPPLE

129. Paragraphs 1 through 128 are incorporated by reference into this Count III.

130. In October 2003, the Corps provided an Estopple Certificate to induce a loan of approximately $1,000,000 to Bass. In the Estopple Certificate, Torrey certified that Bass was "not in default on any term or condition of the [Lease Agreement.]"

131. At the time Torrey signed the Estopple Certificate he was the Contracting Officer and had the authority to act on behalf of the Corps in signing and issuing the Estopple Certificate.

132. At the time the CO executed and issued the Estopple Certificate, he knew the bank and Bass relied on the representations that Bass was in compliance with all terms and conditions of the Lease Agreement. At the time the CO intended for Bass to rely on the

representation in undertaking the loan obligation and using the loan proceeds to improve the concession facilities at Lake Ouachita.

133. Bass reasonably relied to its detriment on the Corps' representation in the Estopple Certificate in undertaking the loan and using the loan proceeds to make improvements to Brady Mountain concession.

134. The Corps benefited from Bass' use of the loan proceeds to improve the Brady Mountain concession.

135. It was inequitable and unfair for the Corps to now assert that Bass under reported its Gross receipts prior to the date the Estopple Certificate was signed by Torrey.

136. Accordingly, the Corps must be permanently estopped and forever enjoined from asserting or in any manner suggesting Bass was in default on any term or condition of the Lease Agreement in any respect prior to the time the Estoppel Certificate was executed in October 2003.

## XVI. COUNT IV: VIOLATION OF REGULATION

137. Paragraphs 1 through 136 are incorporated by reference into this Count IV.

138. A guiding principle of the Federal Acquisition Regulation system ("FAR") is for the government official to promote competition and to conduct government's business with integrity, fairness and openness. See 48 C.R.F. §1.102 (b)(.1)(iii) & (b)(3). FAR also requires the contracting officer to insure contractors receive impartial, fair and equitable treatment. See 48 C.R.F. §1.602-2(b). These regulations are intended to protect and to benefit government commercial concessionaires, including Bass.

139. The FAR regulations and fundamental government contracting principles impose a duty upon the Corps and the CO to avoid preferential treatment of one concessionaire over another.

140. As a government concessionaire, Bass is entitled to the benefits of these regulations and an even handed, fair play field of competition where it can compete on merit with Mountain.

141. At all times relevant to this Complaint, Mountain and Brady Mountain were competitors on Lake Ouachita.

142. The favoritism and preferential treatment of Mountain include free sewer service, substantially lower rental structure when expanding acreage, exemption from audit, exemption from professional certifications, and protection from competition.

143. By giving discriminatory, favorable accommodations and preferential treatment to Mountain and its owner, the Corps and CO have violated regulatory duties to promote competition and treat concessionaires fairly, impartially and equitably.

144. This pattern of favoritism and preferential treatment of Mountain substantially and unfairly increased cost and burden of operating the Brady Mountain concession and placed Bass at an unfair competitive disadvantage.

145. As a direct, foreseeable result of the violations of these regulations, Bass has suffered damages, including loss profits, loss business opportunity and increased operational cost.

## XVII. COUNT V: INJUNCTION: COMPETITION

146. Paragraphs 1 through 145 incorporated by reference into Count V.

147. As set out above, the Corps has singled out Bass for administrative action that unfairly and inequitably increases Bass' operating cost and burden which exempting Mountain from similar administrative action. The Corps cut the water supply to the Brady Mountain concession. The Corps refused to provide Brady Mountain with sewer service, while providing such service to Mountain for free. Also, the Corps singled out Bass for an

audit and for professional certifications while exempting Mountain from any audit or certification requirement.

148. In allowing Mountain to expand its concession acreage while basically maintaining its old rent structure, the Corps gave Mountain an unfair and inequitable competitive advantage over Bass.

149. As a consequence the Corps must be permanently enjoined and prohibited from providing an unfair competitive advantage to Mountain and for giving Mountain unfair preferential treatment to the competitive disadvantage of Bass.

## XVIII. COUNT VI: INJUNCTION: STOP ACCUSATIONS

150. Paragraphs 1 through 149 are incorporated by reference into this Count V.

151. Since 2003, the Corps has repeatedly, wrongfully and in bad faith asserted that prior to 2003, Bass under-reported its Gross receipts. The Corps has used this assertion in various forms to intimidate, oppress and damage Bass.

152. The Corps knows and should know that Bass properly reported its Gross receipts prior to 2003 and that Bass acted in good faith in reporting its Gross receipts and calculating rent.

153. As a consequence, the Corps must be permanently enjoined and prohibited from asserting that Bass under-reported its Gross receipts by failing to include its sublessees gross income in the Gross receipts number reported to the Corps and from using any variation of that assertion as a bases for refusing to consider or to block Bass' proposal to purchase any other Corps administered concession, for refusing to issue an Estoppel Certificate, and for refusing to provide Bass with a recommendation for other business opportunities.

## XIX. COUNT VII: MANDATORY INJUNCTION

154. Paragraphs 1 through 153 are incorporated by reference into this Count VI.

155. As set forth above, the Corps and the CO have engaged in a prolonged bad faith course of conduct of intimidation, harassment and oppression with a specific intent to inflict financial damage on Bass and to ultimately eliminate Bass from being a government contractor. This course of conduct is motivated by malice and a personal animus against Bass and Ned Bass by Corps officials in the Vicksburg District.

156. The duration and extensiveness of the course of conduct demonstrates such a degree of bad faith and personal animus that can only be remedied by substitution of completely new administrative group free from any continuing supervision or influence of the Corps Vicksburg District office.

157. Accordingly, the only effective remedy to insure the administration of the Brady Mountain concession is fair, impartial and equitable, is to require the Secretary of Army to transfer the administration of Brady Mountain concession and the consideration and approval of any proposed renewal or purchase of a commercial recreational concession by Bass to the Corps of Engineers, Little Rock District and to prohibit the Corps officials in the Vicksburg District from having any input into or influence over the supervision and administration of any Bass operated commercial concession.

## XX. RELIEF

Having given notice of the above causes of action, Bass Management prays this Court enter judgment in Bass' favor and against the United States Corps of Engineers as follows:

(a) Bass demands a money judgment for the excess rental paid to the Corps in an amount to be shown at trial but more than $153,149;

(b) Bass demands as part of the money judgment interest as provided by law and as

provided under the Lease Agreement in an amount to be shown at trial;

(c) Bass demands a money judgment for all attorney and accountant fees and expenses incurred in dealing with the criminal investigation and the debarment proceeding in an amount to be shown at trial;

(d) Bass demands a money judgment for loss profits from wrongful blocking of Bass' purchase of the Swaha Lodge concession at Lake Greeson in an amount to be shown at trial;

(e) Bass demands that the Corps be mandatorily enjoined and estopped from asserting, claiming or alleging Bass was in breach of any term or condition of the Lease Agreement prior to the date of the issuance the Estoppel Certificate in October 2003;

(f) Bass demands a money judgment for the difference between the Graduated Rental System rates and the rental rate calculated under its prior lease for the period of January 1, 1996 through February 28, 2005 or in the alternative, that its present rental be reduced and equitably adjusted so as to use the rental structure in the prior lease agreement for a period of nine (9) years and two (2) months;

(g) Bass demands the Corps be enjoined and prohibited from giving other concessionaires favorable and preferential treatment in administration of the concession at Lake Ouachita, be mandatorily enjoined to provide free sewer services comparable to those provided to Mountain Lake, be mandatorily enjoined to resume water service to Brady Mountain and enjoined from taking administrative action or exercising contractual rights against Bass unless the same or equivalent action is taken with respect to Mountain.

(h) Bass demands the Corps be enjoined and prohibited from using an audit of 1999-2002 or alleged dispute over under-reported Gross receipts as a bases to refuse to provide a favorable recommendation of Bass and/or issuance of an Estoppel Certificate and as a bases to block Bass' purchase of the Swaha Lodge concession or award of any other commercial

concession;

(i) Bass demands the Corps be estopped and enjoined from asserting or contending in any respect that Bass was in default of any term or condition of the Lease Agreement prior to the date of the October 2003 Estopple Certificate and that Bass under reported its Gross receipts by failing to include the gross income of its sublessees;

(j) Bass demands the Corps be mandatorily enjoined and required to transfer all administrative supervision of Bass' Brady Mountain Resort commercial concession at Lake Ouachita and all review and approval (and subsequent administration) of Bass proposed purchase of a commercial concession at any other Corps administered recreational lake or river to the Corps' Little Rock District and enjoin and prohibit the CO or Vicksburg District officials from having any input or participation in any respect or manner in the administration and supervision of any Bass concession;

(k) Bass demands the Corps be enjoined and prohibited from requesting, conducting or continuing any audit of Bass until such time it has audited and caused to be audited all other concessionaires at Lake Ouachita;

(l) Bass demands the cost of this action, including reasonable attorney fees, as permitted by law and as allowable as relief to these causes of action;

(m) Bass demands prejudgment and post judgment interest on all amounts awarded, as permitted by law and by contract; and

(n) Bass request the Court grant such further relief as the Court deems just and proper.

Respectfully submitted,

BASS MANAGEMENT

BENTON N. "NED" BASS
PRESIDENT

DATED: January 25, 2007

/s/ Frank W. Trapp
FRANK W. TRAPP
Counsel for Bass Management, Inc.

OF COUNSEL:

PHELPS DUNBAR LLP
111 East Capitol Street
Suite 600
Jackson, Mississippi 39201
Telephone: 601/352-2300
Facsimile: 601/360-9777