Bass Management, Inc.
4120 Brady Mountain Road
Royal, Arkansas 71968
Phone: (501) 767-3422
Fax: (501) 767-6506
E-mail: bradymtn@hsnp.com

July 6, 2006

EXHIBIT
B

Burke S. Torrey
Chief, Real Estate Division
Department of the Army
Vicksburg District, Corps of Engineers
4155 Clay Street
Vicksburg, Mississippi 39183-3435

Re: ***Bass Management, Inc.'s demand for return of excess rent payments and other contractual and regulatory relief***

Dear Mr. Torrey

This letter is written to you as Contracting Officer ("CO") for the U. S. Department of the Army, Corps of Engineers ("Corps") for the Lease Agreement effective January 1, 1996 ("Lease"), between the Corps and Bass Management, Inc. ("Bass Mgmt.") for the Brady Mountain Resort ("Resort") at Lake Ouachita, Garland County, Arkansas. The Lease bears the designation of No. DACW38-1-96-46. This demand is submitted pursuant to the Dispute Clause in Paragraph 32 of the Lease and applicable law and regulations.

## I. Demand for return of money

Bass Mgmt. demands that the Corps return the excess rental payments it made from 2003 through May 2006 in the total amount of $122,009, plus interest. See Exhibit "A" attached to this letter for the calculation. Bass Mgmt. also demands that the Corps stop requiring Bass Mgmt. to pay rent based on the Corps unilateral and arbitrary verbal change to the Lease made in 2003. In 2003, the Corps imposed on Bass Mgmt. and its sublessees a requirement that rental no longer be based upon Bass Mgmt.'s gross receipts but rather those receipts plus the gross receipts of the sublessees.

This unilateral action was improper and unauthorized under the Lease. This arbitrary action breaches the word and intent of this contract and the practice from its inception through 2002. Accordingly, Bass Mgmt. is entitled to recovery of the excess rent, plus interest, it had to pay as result of the Corps requiring it to calculate the annual rental rates and pay monthly rent based on the sum of the sublessees' gross income added to Bass Mgmt.'s gross receipts.

### a) Clear meaning

Paragraph 2. Consideration of the Lease sets out the method for calculating the annual percentage and monthly rental payment. The calculation of both the annual "Revised Graduated Rental System" rate and the monthly rent payment is based on gross receipts. Subparagraph 2 a.(1) provides that "Gross receipts are defined as the total of the concessionaire's receipts from business operations conducted on the premises, including receipts of sublessees and licensees."

From 1996 through 2002, the parties correctly understood that the "Gross Receipts" definition found in Paragraph 2 a.(1) of the Lease meant Bass Mgmt.'s gross receipts. The definition defines Gross Receipts as "the total of the **concessionaire's** receipts." This phrase "the total of the concessionaire's receipts" is central to the definition. By this definition, to state the obvious, "the concessionaire" is not the concession. One is a business entity, the other is real estate. One is a lessee, the other is property leased and the right of use attached to the lease. Accordingly, receipts of "the concessionaire" are less than receipts of all business activity within the concession, because sublessees also operated within the concession.

The "Gross Receipts" definition plainly limits itself to "the concessionaire's receipts"; it does <u>NOT</u> say gross income of all the various business entities that operate within the concession. "[T]he concessionaire" is Bass Mgmt. The receipts that constitute "Gross Receipts" are therefore Bass Mgmt.'s gross receipts. The subordinate, tag on phrase, "including receipts of sublessees" cannot expand "the concessionaire's receipts" to include receipts that are <u>not</u> Bass Mgmt. receipts.

Some of the receipts of sublessees are included in "the concessionaire's receipts," because the sublessees make rental payments to Bass Mgmt. Thus the phrase "including receipts of sublessees" means in this context, rental payments of sublessees received by Bass Mgmt. are to be included in the "Gross Receipts" reported to the Corps. This is how Bass Mgmt. reported "Gross Receipts" from 1996 through 2002.

On the other hand, Bass Mgmt.'s gross receipts do not include the third party sublessees' gross income. The sublessees are independent business entities, with their own ownership, assets, debts and books and records. Bass Mgmt. has no control, ownership of or interest in its sublessees. The sublessees' income comes from independent operations. Bass Mgmt. has no interest in or control over these separate businesses' income. The total of Bass Mgmt.'s receipts simply do not and cannot include gross income of its sublessees. Thus "the total of the concessionaire's receipts" cannot reasonably be read to encompass the gross receipts of the sublessees.

Since "the total of the concessionaire's receipts" does not include the gross income of the sublessees, it is incorrect and improper to require the sublessees gross income be included in the rent calculation of either the annual rental percentage or monthly rental payment. When the Corps imposed this requirement on Bass Mgmt., it exceeded its authority and breached the contract. The Corps was not entitled the excess rental payments made by Bass Mgmt. and those payments must be returned.

**b) Surrounding circumstances**

Bass Mgmt. correctly interpreted the Lease to only require reporting of its gross receipts. To repeat, that is how Bass Mgmt. reported its "Gross Receipts" to the Corps from 1996 through 2002. That understanding was consistent with the practice under the earlier lease agreement assigned to Bass Mgmt. in 1986. As you will recall, under the old lease agreement, the Corps'

monthly reporting form broke out by line items the various activities that made up Gross Receipts. These included receipts from activities such as "Income from dive shops." Guided by this format, Bass Mgmt. entered the income received from a sublessee and its operation in the applicable detail line. Rather than continue that format, the monthly reporting form for the new Lease, simply lumped all those activities together into a single "Gross Receipts" line. Given this context, it is obvious that the subordinate tag on phrase "including receipts of sublessees" served as a reminder those sublessee payments to Bass Mgmt. continued to be included in Gross Receipts report. Thus, while the new Lease made a dramatic increase in the rental percentages, the practice of reporting only Bass Mgmt.'s gross receipts did not change.

By letter dated December 20, 1995, you forwarded the new Lease to Bass Mgmt. In the letter as the CO you specifically instructed Bass Mgmt. to apply the rental percentage, which you based on Bass Mgmt.'s gross income, to "your gross sales." To a layman, "gross sales" means gross receipts or income and "your" clearly referred to Bass Mgmt. That was a clear instruction by you for Bass Mgmt. to pay on its gross receipts. You said nothing about including sublessees gross receipts. Your instruction was entirely consistent with Bass Mgmt.'s understanding of what was intended by the Corps and its understanding of the "Gross Receipts" definition in the new Lease.

Indeed, at the time Bass Mgmt. signed the Lease, it had an existing sublease with Hill's Lake Escape ("Hill's") (referred to as "Hill's old sublease"). The Hill's old sublease had been approved by the Corps. Hill's old sublease had a fixed, flat rate rental fee similar to the rental provision in the current sublease.[1] The Hill's old lease made no provision for monthly reporting of its gross receipts to Bass Mgmt. or the Corps. It made no provision for paying a percentage of its gross receipts to Bass Mgmt. for pass through to the Corps. Accordingly, in January 1996 Bass Mgmt. would have had no ability to comply with the new Lease if the current 2003 Corps requirement had then been in place. Moreover, if Bass Mgmt. had been required to start using Hill's gross income in calculating and paying rent, then overnight Bass Mgmt. would have started losing money on the Hill's old sublease. Literally, Bass Mgmt. would have had to pay out of its own pocket to have the Hill's operate out of the Resort. Such a result is untenable and conflicts with the guiding principles applicable to all government contracts.

Approximately two (2) years later in 1998, Bass Mgmt. submitted a new Hill's sublease to you for review and approval. That new sublease continued the fixed flat rate rental by requiring an annual rental payment of $2000 for a floating office and $1000 per boat slip. The new sublease had no specific provision for monthly reporting Hill's gross receipts and no specific provision for pass through payments to the Corps based on a percentage of Hill's gross income. Surely if the Corps intended for Bass Mgmt. to report to the Corps and to pay the Corps based on including Hill's gross receipts rather than the agreed fixed flat rate rental then the Corps would not have approved the Hill's sublease. After careful review you as the CO approved the new Hill's sublease as written.

---

[1] Bass Mgmt. has been unable to locate a copy of this old Lease but best recollection is that in material parts it followed the 1998 sublease.

If Bass Mgmt. had any idea the Corps was going to dictate a change in how "Gross Receipts" was calculated then it would not have agreed to a new sublease with Hill's that would be a money loser with this change. Bass Mgmt. was comfortable continuing the fixed flat rate rent with Hill's because two (2) years earlier, you had instructed Bass Mgmt. to pay rent on "your gross sales."

c) **2003 Required change**

For reasons that are unclear, very early in 2003 a representative of the Corps instructed Bass Mgmt. that the Corps was unilaterally changing the method of calculating "Gross Receipts." We understand the Corps also instructed sublessees to make this change. The Corps required Bass Mgmt. and its sublessees to begin to report and pay based on including the sublessees gross income along with Bass Mgmt.'s gross receipts in making the rental calculation. This change was arbitrarily dictated by the Corps. It constitutes a breach of the clear wording of the Lease, was contrary to the intent of the Corps and Bass Mgmt. in 1996 and changed the practice followed from 1996 to 2002.

You and your staff failed and refused to reduce this verbal directive to writing. Under compulsion Bass Mgmt. complied with the new requirement to the best of its ability. This unilateral, unauthorized change increased expenses and strained Bass Mgmt.'s relationship with its sublessees.

d) **Relief**

Bass Mgmt. demands return of all excess rent, plus interest, paid to the Corps since it unilaterally imposed the unauthorized amendment to the Lease in 2003. Bass Mgmt. calculates the overpayment to be $122,009, plus interest. See Exhibit "A." In addition to the return of the excess rental payments, Bass Mgmt. demands that the Corps immediately cease and withdraw its requirement that Bass Mgmt. add the sublessees' gross income to its gross receipts when calculating the annual rental percentage and monthly rental payment. And that you affirm that for the duration of the January 1, 1996 Lease, the Corps follow the intended definition that "Gross Receipts" means only Bass Mgmt.'s gross receipts.

II. **Competitor favoritism relief**

The Corps has been providing excessive and improper favoritism to Mountain Lake, Inc. which operates the Mountain Harbor Resort Commercial Concession on Lake Ouachita (referred to as "Mountain.") The favoritism has provided a financial windfall to Mountain since at least 1996. It has placed Bass Mgmt. at an unfair competitive disadvantage. The unfair financial benefits include: (1) adding over 144 acres to Mountain's concession in 1998 while allowing Mountain to continue the old declining percentage, essentially 1% rental formula. When Bass Mgmt. added land to its concession in 1996, the Corps required a new lease. The new lease had graduated rental rates. This graduated rental rate resulted in Bass Mgmt. paying substantially more rent than it would have paid under its old rent calculation. The old rent calculation was

like the 1% rate Mountain was allowed to continue to use. (2) The Corps allowed Mountain to tie into and use a sewer system operated by the Corps free of charge. This free sewer service has been a substantial financial and operational windfall to Mountain. Upon information and belief, Mountain continues to enjoy this free service. (3) In 2003 the Corps initiated and caused to be initiated an audit of Bass Mgmt. Upon information and belief Mountain has not been subject to an audit.

This audit was not intended to examine the accuracy of Bass Mgmt.'s monthly report of its gross receipts for 1999-2001. Rather the audit is premised on an erroneous assertion that Bass Mgmt. should have included sublessees' gross income in its reports. The "audit" was continued even though the Corps, in an Estoppel Certificate signed by you in October 2003, certified that Bass Mgmt. was not in default of any term or condition of the Lease Agreement. It appears the audit was intended to increase expenses and impede and disrupt Bass Mgmt.'s efforts to expand and to improve the Resort. This provides a huge competitive advantage to Mountain.

As CO you are charged with the duty and obligation to be fair and even handed. Stated guiding principles of the Federal Acquisition System require the promotion of competition and the conduct of the [Corps] business with integrity, fairness and openness. *See 48 CFR §1.102.* The Lease Agreement between the Corps and Bass Mgmt. has an implied covenant of good faith and fair dealing and of cooperation. Yet in spite of these mandates, the Corps has provided a substantial financial benefit to Mountain through highly favorable rental rates, free services and "a free ticket" from any audit. There is no rational, prudent business bases for this preferential treatment of Mountain.

In order to level the playing field and to compensate Bass Mgmt. for the unfair financial burden imposed by this conduct, Bass Mgmt. demands you as CO and the Corps to equitably adjust its rental rate downward to 1% of Bass Mgmt.'s gross receipts (gross sales) for a period of a minimum of ten (10) years or such longer time as required to restore competitive balance between Mountain and Bass Mgmt. In addition, you and the Corps must allow Bass Mgmt. to tie into the existing Corps sewage treatment system for the operating fee (if any) paid by Mountain.

**III. Cease pattern of harassment**

As mentioned above, in October 2003 in your capacity as CO, you issued an Estoppel Certificate to the Summit Bank. In the Estoppel Certificate you certify that Bass Mgmt. is not in default with any term of the Lease Agreement. Both Bass Mgmt. and Summit Bank relied upon this certification in consummation of a loan. Indeed, in reliance on your word spoken in your official capacity, Bass Mgmt. borrowed nearly $1,000,000 that was then used to make improvements at the Lake Ouachita concession.

At the time the Estoppel Certificate was issued, your staff had months earlier verbally required Bass Mgmt. to change the method of calculating gross receipts by adding in the gross income of sublessees. It is undisputable, that both you and your staff knew how Bass Mgmt. had calculated Gross Receipts from 1996 through 2002. The Estoppel Certificate demonstrates the

2003 change in rent calculation to include gross income of sublessees was an unauthorized, unilaterally imposed requirement that was not contemplated by the language of the Lease Agreement or original intent of the parties.

In spite of your certification that, in essence, the method of calculating and paying rent used by Bass Mgmt. from 1996 through 2002 complied with the Lease, the Corps has caused the audit of Bass Mgmt. discussed above. As noted, the audit was premised upon the unfounded accusation that Bass Mgmt. had been incorrectly calculating rent from 1996 through 2002. The Corps has also initiated a debarment proceeding based on the same unfounded accusation.

Accordingly, you must inform the auditors that Bass Mgmt. was in compliance with the Lease when from 1996 through 2002 it submitted monthly "Gross Receipts" reports based upon Bass Mgmt.'s gross income. And you must also inform the auditors that because Bass Mgmt. and the Summit Bank relied on your certification of compliance in obtaining the nearly $1,000,000 loan, that the Corps and auditors cannot in good conscious, fairness and equity content Bass Mgmt. was not in compliance because it reported only its gross receipts from 1996 through 2002.

In addition as CO you, as well as your staff, and other Corps employees must cease the discriminatory conduct intended to harass, intimidate and punish Bass Mgmt. You must cease requiring Bass Mgmt. to give you assurances of compliance with provision of the Lease such as fire code and disabled access, where these demands are not made of other concessionaires and compliance has been adequately reviewed during the yearly compliance inspection. Similarly, you must report to appropriate parties that as CO you have found based on the language, intent and practice that Bass Mgmt. not only demonstrated its good faith belief it was acting properly in reporting Gross Receipts from 1996 through 2002 but also the Corps now agrees that Bass Mgmt. was correct and will be refunding excess rental paid by Bass Mgmt. since 2003.

Since the amount of money sought exceeds $50,000, I certify this demand is submitted in good faith and that to the best of my information and belief all of the above matters are true, correct and complete and the calculation of excess rent payments are accurate and complete. I have also attached a verified certification as Exhibit "B" which is part of this demand.

I look forward to your prompt response.

Sincerely,

Benton N. "Ned" Bass
President, Bass Management, Inc.

BNB:abb
Enclosures

# BASS MANAGEMENT, INC.
## "CALCULATION OF EXCESS RENT PAYMENTS TO CORPS OF ENGINEERS"

| | 2003 | 2004 | 2005 | THRU MAY 2006 |
|---|---|---|---|---|
| BASS GROSS RECEIPTS SUBJECT TO CORPS RENT | $1,622,025 | $1,840,054 | $1,794,913 | $735,482 |
| RENT PERCENTAGE | 2.6% | 2.9% | 3.0% | 2.90% |
| ACTUAL AMOUNT OWED TO CORPS | $42,173 | $53,362 | $53,847 | $21,329 |
| PAYMENT TO CORPS PER MONTHLY REPORTS (INCLUDING SUB LESSEE PASS THRUS) | 66,847 | 93,285 | 98,305 | 34,283 |
| EXCESS RENT PAYMENTS TO CORPS OF ENGINEERS | $24,674 | $39,923 | $44,458 | $12,954 |

EXHIBIT
A

**CERTIFICATION**

Benton N. "Ned" Bass, after being duly sworn, states the following:

1. My name is Benton N. "Ned" Bass. I am the primary owner and operator of Bass Management, Inc..("Bass Mgmt."). I am the President of Bass Mgmt. and authorized to make this certification on its behalf.

2. Bass Mgmt. operates Brady Mountain Resort concession located on property leased from the U. S. Department of Army, Corps of Engineers ("Corps") at Lake Ouachita, Garland County, Arkansas. I have operated the Brady Mountain Resort since 1986. In late 1995, Bass Mgmt. signed a new lease with the Corps for the Brady Mountain Resort. The new Lease Agreement was effective January 1, 1996.

3. Pursuant to Paragraph 32. Dispute Clause of the Lease Agreement, Bass Mgmt. is submitting a demand to the Corps for return of excess rent paid to the Corps from 2003 to the present and other relief. The demand letter is being submitted to Mr. Burke S. Torrey, the Contracting Officer for the Corps. This verified certification is submitted as part of the demand.

4. The demand for return of excess rent and other relief is made in good faith and with the good faith belief that Bass Mgmt. is entitled to the relief.

5. I certify that to the best of my knowledge, information and belief that the matters set out in the demand letter are true, complete and correct. I further certify that to the best of my knowledge, information and belief Bass Mgmt. is entitled to the $122,009 plus interest demanded and the calculation of that amount is accurate and complete.

EXHIBIT

B

THIS THE 6 day of July, 2006.

Benton N. "Ned" Bass
President, Bass Management, Inc.

STATE OF AR
COUNTY OF Garland

VERIFICATION

I, Benton N. "Ned" Bass, am President of Bass Management, Inc. and am authorized to sign on its behalf and state on oath that I have signed the foregoing certification in my capacity as President of Bass Management, Inc., and the statements contained therein are true and correct to the best of my knowledge, information and belief.

Benton N. "Ned" Bass

SUBSCRIBED AND SWORN to before me, a Notary Public, this 6th day of July, 2006.

NOTARY PUBLIC

My Commission Expires:
June 23, 13

SHEILA CLAYTON
Garland County
My Commission Expires
June 23, 2013

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

OFFICIAL USE
VICKSBURG, MS 39183

| | | |
|---|---|---|
| Postage | $ 0.87 | UNIT ID: 0903 |
| Certified Fee | 2.40 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | 1.85 | |
| Restricted Delivery Fee (Endorsement Required) | | Clerk: KKVFSY |
| Total Postage & Fees | $ 5.12 | 07/06/06 |

Sent To [illegible]
Street, Apt. No.; or PO Box No. [illegible]
City, State, ZIP+4 [illegible]

PS Form 3800, June 2002 See Reverse for Instructions

7005 1160 0003 0835 3022

UNITED STATES POSTAL SERVICE

***** WELCOME TO *****
ALBERT PIKE STA
HOT SPRINGS, AR 71913-9998
07/06/06 02:48PM

| | | | |
|---|---|---|---|
| Store | USPS | Trans | 181 |
| Wkstn | sys5004 | Cashier | KKVFSY |
| Cashier's Name | | Kenneth | |
| Stock Unit Id | | SIAKEN | |
| PO Phone Number | | 501-623-7482 | |
| USPS # | | 0451330903 | |

1. First Class 5.12
Destination: 39183
Weight: 2.40 oz.
Postage Type: PVI
Total Cost: 5.12
Base Rate: 0.87
SERVICES
Certified Mail 2.40
70051160000308353022
Rtn Recpt (Green Card) 1.85
2. 39c Lb/Flg PS100 39.00

Subtotal 44.12
Total 44.12

Cash 60.00
Change Due
Cash 15.88

Order stamps at USPS.com/shop or call 1-800-Stamp24. Go to USPS.com/clicknship to print shipping labels with postage. For other information call 1-800-ASK-USPS.

Number of Items Sold: 2

Thank You
Please come again!

# TRANSACTION REPORT

JUL-10-2006 MON 07:14 AM

TX (MEMORY)

| # | DATE | START TIME | RECEIVER | COM. TIME | PAGES | TYPE/NOTE | DEPT | FILE |
|---|---|---|---|---|---|---|---|---|
| 001 | JUL-10 | 07:12 AM | 18016315254 | 0:02:06 | 10 | SG3 OK | | 538 |
| | | | TOTAL | 0:02:06 | 10 | | | |

FAXED TO CORPS.

**DEPARTMENT OF THE ARMY**
VICKSBURG DISTRICT, CORPS OF ENGINEERS
4155 CLAY STREET
VICKSBURG, MISSISSIPPI 39183-3435

REPLY TO
ATTENTION OF:

August 28, 2006

Real Estate Division

Bass Management, Inc.
4120 Brady Mountain Road
Royal, Arkansas 71968

Dear Mr. Bass:

In response to your letter of July 6, 2006, requesting a Contracting Officer's Decision, we are unable to respond to your letter within the normal sixty day time frame due to Hurricane Katrina and other workload constraints. We will issue a decision by December 18, 2006, on your claims.

Sincerely,

Burke S. Torrey

Burke S. Torrey
Chief, Real Estate Division

CERTIFIED MAIL: 7005 1820 0007 3814 0907

EXHIBIT
C

DEPARTMENT OF THE ARMY
VICKSBURG DISTRICT, CORPS OF ENGINEERS
4155 CLAY STREET
VICKSBURG, MISSISSIPPI 39183-3435

REPLY TO
ATTENTION OF:

September 5, 2006

Real Estate Division

Bass Management, Inc.
4120 Brady Mountain Road
Royal, Arkansas 71968

Dear Mr. Bass:

In response to your letter of September 1, 2006, according to FAR 33.211, if a decision will not be issued within sixty days, the contracting officer will notify the contractor, within that period, of the time within a decision will be issued. In my letter of August 28, 2006, I advised that a decision would be issued by December 18, 2006. That decision stands. As a point of clarity, nothing was said in my letter of August 28, 2006, about debarment.

Sincerely,

Burke S. Torrey
Chief, Real Estate Division

Copy Furnished:

Frank W. Trapp
Phelps Dunbar LLP
P.O. Box 23066
Jackson, Mississippi 39225-3066

CERTIFIED MAIL: 7005 1820 0007 3814 0112

EXHIBIT
D

Brady Mountain Resort & Marina
4120 Brady Mountain Road
Royal, Arkansas 71968
Phone: (501) 767-3422
Fax: (501) 767-6506
Email: bradymtn@hsnp.com
www.bradymtn.com

October 02, 2006

Burke S. Torrey
Real Estate Division
Corps of Engineers
4155 Clay Street
Vicksburg, Mississippi 39183

RE: Letter of Recommendation, Estoppel Certificate

Dear Mr. Torrey,

I have been asked to participate in a Marina project on the Arkansas River next to the Clinton Library. The city of Little Rock has looked at Brady Mountain Resort and it wants a partner with a proven track record. This is a very exciting project and we will be working with the Little Rock Corps of Engineers. I need to know that since our Criminal Investigation is now behind us if I can count on you as my Contracting Officer to write me a favorable letter of recommendation when the city of Little Rock calls.

As you are aware, the Criminal Investigation basically shut down Bass Management, Inc. for three years. I am now exploring the purchase of SWAHA on Lake Greeson again. I need to know if you will now be able to provide me with an Estoppel Certificate as you did in October 2003. I have provided you with a new one that I need back this week so I can explore my banking options.

Mr. Torrey, you know that money that will be needed to purchase SWAHA will now cost me double in interest from three years ago. It just does not seem right.

I await your response.

Sincerely

Ned Bass
Brady Mountain Resort & Marina
Bass Management, Inc.

EXHIBIT
E

DEPARTMENT OF THE ARMY
VICKSBURG DISTRICT, CORPS OF ENGINEERS
4155 CLAY STREET
VICKSBURG, MISSISSIPPI 39183-3435

REPLY TO
ATTENTION OF:

October 5, 2006

Real Estate Division

SUBJECT: Contract No. DACW38-1-96-46

Bass Management, Incorporated
Attention: Mr. Ned Bass
4120 Brady Mountain Road
Royal, Arkansas 71968

Dear Mr. Bass:

I am responding to your two letters dated October 2, 2006. In response to your letter entitled "Re: Ned Bass, etc.," I decline to discuss the particulars of the investigation. As required by our regulations, the matter was referred to the U.S. Criminal Investigation Command (CID), which in turn referred it to the United States Attorney's Office.

In response to your letter entitled "RE: Letter of Recommendation, etc.," it has been explained to your repeatedly that a routine audit revealed major discrepancies between what you were reporting to us as income and what you were actually paying under the lease. Since an active dispute still exists between the Corps and Bass Management, Inc. over the alleged under-reporting of gross receipts, I decline your request for an estoppel certificate and a letter of recommendation. I will also use this letter to note that you called me on 4 October 2006 and that we discussed these issues from my perspective as Contracting Officer of Contract No. DACW38-1-96-46 only.

Sincerely,

EXHIBIT
F

Burke S. Torrey
Chief, Real Estate Division

Return Receipt: 7005 1820 0007 3814 0129

DEPARTMENT OF THE ARMY
VICKSBURG DISTRICT, CORPS OF ENGINEERS
4155 CLAY STREET
VICKSBURG, MISSISSIPPI 39183-3435

REPLY TO
ATTENTION OF:

November 9, 2006

Real Estate Division

Bass Management, Inc.
ATTN: Mr. Ned Bass
4120 Brady Mountain Road
Royal, Arkansas 71968

Dear Mr. Bass:

Circumstances have changed since I wrote you setting a date of December 18, 2006, for a Contracting Officer's Decision. Because action is still pending with the Criminal Investigation Command, I am prohibited from acting on administrative matters directly related to the referred case as long as allegations of fraud remain. Accordingly, it will be an indefinite time before I am able to give you a Contracting Officer's Decision.

Sincerely,

Burke S. Torrey
Chief, Real Estate Division

Certified Mail Return Receipt: 7005 1820 0007 3814 0136

EXHIBIT
G

## SUMMARY OF GROSS RECEIPTS FROM BUSINESS OPERATIONS

TO: Commander, U. S. Army Engineer District, Vicksburg
ATTN: CELMK-RE-MM, P. O. Box 60, Vicksburg, Mississippi 39180-0060

Lease No. | Name of Site | Period From to En

Name of Lessee | Address

| Activity | Amoun |
|---|---|
| Furnishing facilities for mooring or docking privately owned boats | $ |
| Servicing, repairing, and maintaining privately owned boats | |
| Motor rentals | |
| Hiring of boats without motors | |
| Hiring of boats with motors | |
| Furnishing space for transient trailers | |
| Furnishing space for non-transient trailers | |
| Rental of cabins or other facilities | |
| Income from dive shops | |
| Sale of gasoline and oil | |
| Sale of boats and boat accessories | |
| Sale of food, refreshments, and fishing tackle | |
| Sale of minnows, worms, or other live bait | |
| Other income (Specify) | |
| | |
| Audit adjustment (Debit or Credit) | |
| TOTAL GROSS RECEIPTS.................................................. | $ |
| LESS: Sales Tax Paid to State.................................... | |
| Net Income Subject to Rental 3%..................$ ____ | $ |
| 2%.................... ____ | |
| 1%.................... ____ | |
| TOTAL RENTAL DUE........................................................ | $ |

I certify that the amounts shown above constitute the entire returns from all business operations conducted under the above noted lease. Certified check or money order drawn to the order of the Treasurer of the United States in the amount of total rental due is attached hereto.

______________________________
Signature of Lessee

Receipt of this summary from the Lessee named above is acknowledged on this

date, ______________________, by ______________________________

______________________________
(Title)

INSTRUCTIONS: Make three copies and mail with remittance to the Commander to the above address.

CELMK Form 439
OCT 87

(Proponent CELMK-RE-

EXHIBIT
H

DEPARTMENT OF THE ARMY
VICKSBURG DISTRICT, CORPS OF ENGINEERS
2101 NORTH FRONTAGE ROAD
VICKSBURG MISSISSIPPI 39180-5191

REPLY TO ATTENTION OF:

December 20, 1995

Real Estate Division
Management and Disposal

SUBJECT: Lake Ouachita, Arkansas, Lease No. DACW38-1-96-46, Brady Mountain Resort

Mr. Benton N. Bass, President
Bass Management, Inc.
4120 Brady Mountain Road
Royal, Arkansas 71968

Dear Mr. Bass:

Enclosed you will find an executed lease for commercial concession purposes for a term of twenty-five years beginning January 1, 1996 (enclosure 1).

Your monthly rent will be 2.3 percent of your gross sales payable monthly with the first payment due February 11, 1996. Sale receipts from boats and motors are excluded and assessed a straight one percent rent.

I have enclosed a form for calculating your monthly rental payment (enclosure 2). Please submit this form with your rent payment each month.

Should you have any questions regarding this matter, please contact Mr. Bill Mayfield at (601) 631-7488.

Sincerely,

Burke S. Torrey

Burke S. Torrey
Chief, Real Estate Division

Enclosures

EXHIBIT
I

# ESTOPPEL CERTIFICATE

BOOK 2345 PAGE 0086

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, Burke S. Torrey, Chief of the Real Estate Division, Vicksburg District, of the United States Army Corps of Engineers, states that the United States of America is the owner of the following described land situated in Garland County, Arkansas, to wit:

SEE ATTACHMENT MARKED "EXHIBIT A"

The aforesaid lands are subject to a lease agreement dated January 1, 1996, between the United States Department of the Army as Lessor and Bass Management Inc. as Lessee. A copy of said lease is attached and marked "Exhibit B".

The undersigned hereby states that the aforesaid lease is true and correct, that there are no amendments or modifications, that said lease is in full force and effect and that the Lessee, Bass Management Inc., is not in default as to any of the terms and conditions of said lease as of the date of this instrument.

CERTIFICATE OF RECORD
I, Vicki E. Rima, Circuit Clerk and Ex-officio Recorder of Garland County, Arkansas, do hereby certify that this instrument was filed for record in my office as indicated hereon and the same is now duly recorded with the acknowledgment and certificate thereon in Record Book and Page as indicated thereon.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Court on the date indicated hereon.
Vicki E. Rima
Circuit Clerk
Ex-officio Recorder
BY

Witness my hand this 7th day of October, 2003.

Burke S. Torrey
Chief of the Real Estate Division, Vicksburg District
Of the United States Army Corps of Engineers

ACKNOWLEDGEMENT:

STATE OF Mississippi

COUNTY OF Warren

On this 7th day of October, 2003, before me, a Notary Public, personally appeared Burke S. Torrey, Known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the consideration and purposes therein mentioned and set forth.

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES SEPT. 19, 2
BONDED THRU STEGALL NOTARY SERVICE

Notary Public

My Commission Expires

EXHIBIT
J

# EXHIBIT "A"

BOOK 2345 PAGE 0087

A TRACT OF LAND BEING A PART OF THE NE1/4 OF SECTION (8), PART OF THE SE1/4 SE1/4 OF SECTION (5), PART OF THE SW1/4 OF SECTION (4), AND PART OF THE NW1/4 OF SECTION (9), ALL IN TOWNSHIP (2) SOUTH, RANGE (21) WEST OF THE FIFTH P.M. IN GARLAND COUNTY ARKANSAS, DESCRIBED AS FOLLOWS: COMMENCE AT THE SOUTHEAST CORNER OF THE SAID NE1/4 OF SECTION (8), AS MARKED BY A 3" DIA. BRASS CAP MONUMENT SET 1972 BY THE B.L.M., AND RUN N00°12'00"E ALONG THE EAST LINE OF THE NE1/4 OF SAID SECTION (8), 330.09 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 AND THE POINT OF BEGINNING. THENCE N88°28'27"W PARALLEL WITH THE SOUTH LINE OF THE SAID NW1/4 OF SECTION (9), 824.72 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE S71°45'00"W, 127.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 ON THE 578 FT. CONTOUR OF LAKE OUACHITA; THENCE MEANDERING ALONG AND WITH THE SAID 578 FT. CONTOUR IN A NORTHERLY DIRECTION 1782.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE LEAVING THE SAID 578 FT. CONTOUR AT N08°30'00"E FOR 220.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N67°30'00"W, 209.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N02°30'00"E, 94.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE S77°30'00"E, 162.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N19°30'00"E, 58.00 FT. TO A NAIL ON THE SOUTHERLY EDGE OF A ASPHALT ROAD; THENCE S58°28'43"E ALONG THE SAID EDGE OF A ASPHALT ROAD 66.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N05°53'43"E ACROSS A ASPHALT ROAD 50.94 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 ON THE NORTHERLY EDGE OF A ASPHALT ROAD; THENCE N31°30'47"W ALONG THE EDGE OF THE SAID ASPHALT ROAD 220.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE LEAVING THE SAID EDGE OF ROAD AT N58°29'13"E FOR 30.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N31°30'47"W, 60.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE S58°29'13"W, 30.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 ON THE NORTHERLY EDGE OF A ASPHALT ROAD; THENCE N31°30'47"W ALONG THE SAID EDGE OF A ASPHALT ROAD 176.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE LEAVING THE SAID ROAD AT N29°02'37"E ALONG THE CENTER OF A DRAIN 211.44 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 ON THE 578 FT. CONTOUR OF LAKE OUACHITA; THENCE MEANDERING ALONG AND WITH THE SAID 578 FT. CONTOUR IN A NORTHEASTERLY THEN SOUTHEASTERLY DIRECTION 6322.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE LEAVING THE SAID 578 FT. CONTOUR AT N05°59'55"E ACROSS A COVE, FOR 352.90 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 ON THE 578 FT. CONTOUR OF LAKE OUACHITA; THENCE MEANDERING ALONG AND WITH THE SAID 578 FT. CONTOUR 6984.00 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013 330.00 FT. WEST OF THE EAST LINE OF THE SAID SW1/4 OF SECTION (4); THENCE LEAVING THE SAID 578 FT. CONTOUR AT S00°36'33"W, PARALLEL WITH THE EAST LINE OF THE SAID SW1/4 OF SECTION (4), 1058.21 FT. TO A POINT ON THE NORTH LINE OF THE SAID NW1/4 OF SECTION (9), 330.00 FT. WEST OF THE NORTHEAST CORNER THEREOF; THENCE CONTINUE S00°36'34"W PARALLEL WITH THE EAST LINE OF THE SAID NW1/4 OF SECTION (9), 2301.40 FT. TO A 2" DIA. ALUMINUM CAP ON A NO.5 REBAR BY PLS NO. 1013; THENCE N88°28'27"W PARALLEL WITH AND 330.00 FT. NORTH OF THE SOUTH LINE OF THE SAID NW1/4 OF SECTION (9), 2306.60 FT. TO THE POINT OF BEGINNING. ACCORDING TO SURVEY BY STEVE HAWKINS, PLS No. 1013, ON 11/07/2000.

ROBERT S. LANEY, P.A.

A Professional Corporation

ATTORNEY AND COUNSELOR AT LAW

303 Jackson Street SW
P. O. Box 777
Camden, Arkansas 71711

Telephone. (870) 836-8771
Fax: (870) 836-5772
E-Mail: rslaney@cablelynx.com

September 27, 2006

*VIA FAX NO. 501-767-6506*

Mr. Ned Bass
Brady Mountain Resort & Marina
4120 Brady Mountain Road
Royal, AR 71968

***Re:*** ***Army Corps of Engineers***

Dear Ned:

As per our telephone conversation, this is to confirm that I have received confirmation from David Balwinski of the United States Army, Criminal Investigation Division, that all criminal charges against Ned Bass have been dropped and dismissed and will no longer be pursued.

Mr. Balwinski informed me that he was now in charge of the civil investigation and wanted to wind this matter up as soon as possible, and the only remaining thing was to finish the audit. Now, as an update, I have now talked to him after he had talked to the auditors, and the only thing Mr. Balwinski said the auditors needed now to complete their audit was the gross receipts of the restaurant from 1999 to 2005. They are no longer interested in Ouachita Marine or Hill's Lake Escape. My response to him was that the restaurant, I did not believe, was a sublease, and probably had already been included in the gross receipts report furnished by your accountant. At any rate, I will talk to you this weekend.

Sincerely,

ROBERT S. LANEY, P.A.

Robert S. Laney

EXHIBIT
K
tabbles