NO. DACW38-1-96-46

# DEPARTMENT OF THE ARMY
# LEASE
# FOR COMMERCIAL CONCESSION PURPOSES
# BRADY MOUNTAIN RESORT
# LAKE OUACHITA, ARKANSAS
# GARLAND COUNTY, ARKANSAS

**THIS LEASE** is made on behalf of the United States, between the **SECRETARY OF THE ARMY**, hereinafter referred to as the Secretary, and **Bass Management, Inc.**, hereinafter referred to as the Lessee,

**WITNESSETH:**

That the Secretary, by authority of Title 16, United States Code, Section 460d, and for the consideration hereinafter set forth, hereby leases to the Lessee, the property identified in Exhibits A and B, attached hereto and made a part hereof, hereinafter referred to as the premises, for commercial concession purposes.

**THIS LEASE** is granted subject to the following conditions:

**1. TERM**

Said premises are hereby leased for a term of **twenty-five (25)** years, beginning January 1, 1996 and ending December 31, 2020.

**2. CONSIDERATION**

**a.** The rent due to the United States in consideration of this lease shall be calculated using the Revised Graduated Rental System (RGRS). The total gross receipts for each rental payment period will be multiplied by the applicable percentage rate and the resulting total due payable within twenty-five days to **USAED**, Vicksburg District; 2101 North Frontage Road; Vicksburg, Mississippi 39180-5191.

EXHIBIT

tabbles

A

The percentage rate for the upcoming rental year will be selected from the following RGRS rental rate chart, using the line for the total gross receipts of the ending rental year:

| GROSS RECEIPTS (GR) | % RENT |
|---|---|
| Under $50,000 | 2.0% |
| $50,000-$200,000 | 2.1% |
| $200,000-$400,000 | 2.2% |
| $400,000-$600,000 | 2.3% |
| $600,000-$800,000 | 2.4% |
| $800,000-$1,000,000 | 2.5% |
| $1,000,000-$1,200,000 | 2.6% |
| $1,200,000-$1,400,000 | 2.7% |
| $1,400,000-$1,600,000 | 2.8% |
| $1,600,000-$1,800,000 | 2.9% |
| $1,800,000-$2,000,000 | 3.0% |
| $2,000,000-$2,200,000 | 3.1% |
| $2,200,000-$2,400,000 | 3.2% |
| $2,400,000-$2,600,000 | 3.3% |
| $2,600,000-$2,800,000 | 3.4% |
| $2,800,000-$3,000,000 | 3.5% |
| $3,000,000-$3,200,000 | 3.6% |
| $3,200,000-$3,400,000 | 3.7% |
| $3,400,000-$3,600,000 | 3.8% |
| $3,600,000-$3,800,000 | 3.9% |
| $3,800,000-$4,000,000 | 4.0% |
| $4,000,000-$4,200,000 | 4.1% |
| $4,200,000-$4,400,000 | 4.2% |
| $4,400,000-$4,600,000 | 4.3% |
| $4,600,000-$4,800,000 | 4.4% |
| $4,800,000-$5,000,000 | 4.5% |
| $5,000,001 and above | 4.6% |

(1) Gross receipts are defined as the total of the concessionaire's receipts from business operations conducted on the premises, including receipts of sub-lessees and licensees. No reductions are permitted except the costs of hunting and fishing licenses, and license fees and taxes collected for direct remittance to a taxing authority, and the exact amount collected from customers for electrical service which is metered to the customer and collected by the Lessee as the servicing agent and paid to the power company. Sale receipts from boats and motors are excluded and assessed a straight one-percent rent.

(2) The rental payment shall be monthly with the first payment due February 11, 1996. The rental year will begin on 1 January and end on 31 December.

(3) RENT PAYMENT CALCULATION FORM

Reporting period ____________________

a) Gross receipts for this period: $__________

b) Rent rate: x __________

c) Amount due (a x b) $__________

IF OPTIONAL BOAT RATE SELECTED:

d) Boat and motor sales: $__________

e) Rate: x 0.01

f) Amount due (d x e) $__________

TOTAL DUE (c + f) $__________

b. All rent and other payments due under the terms of this lease must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, 31 U.S.C. § 3717. This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due. The provisions of the statute will be implemented as follows:

(1) The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the later of the due date or the date notification of the amount due is mailed to the Lessee. An administrative charge to cover the cost of processing and handling each late payment will also be imposed.

(2) In addition to the charges set forth above, the United States will impose a penalty charge of six percent (6%) per annum on any payment, or portion thereof, more than ninety (90) days past due. The penalty shall accrue from the date of the delinquency and will continue to accrue until the debt is paid in full.

(3) All payments received will be applied first to any accumulated interest, administrative and penalty charges and then to any unpaid rental or other payment balance. Interest will not accrue on any administrative or late payment penalty charges.

3. NOTICES

All correspondence and notices to be given pursuant to this lease shall be addressed, if to the Lessee, to Bass Management, Inc., 4120 Brady Mountain Road; Royal, Arkansas 71968, and, if to the United States, to the District Engineer, Attn: Chief, Real Estate Division, 2101 North Frontage Road; Vicksburg,

Mississippi 39180-5191, or as may from time to time otherwise bedirected by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper, addressed as aforesaid, and deposited, postage prepaid, in a post office regularly maintained by the United States Postal Service.

4. AUTHORIZED REPRESENTATIVES

Except as otherwise specifically provided, any reference herein to "Secretary of the Army," "District Engineer," "said officer" or "Lessor" shall include their duly authorized representatives. Any reference to "Lessee" shall include sub-lessees, assignees, transferees, concessionaires, and its duly authorized representatives.

5. USE AND DEVELOPMENT OF THE PREMISES

a. The premises may be occupied and used by the Lessee or duly authorized agents, sublessees, assignees, or transferees solely for the conduct of business in connection with the recreational development of the premises for the general use of the public. Lessee shall provide facilities and activities in accordance with the Use and Development Plan and its architectural theme and sign plan, as supplemented or amended.

b. No structure may be erected or altered upon the premises unless and until said Development Plan has been approved in writing by the District Engineer. The District Engineer may require the Lessee, upon completion of each of the proposed developments, to furnish a complete "as built" site plan and "as built" construction plans for all facilities with certification by a Professional Engineer that the construction meets all codes and standards.

6. CONDITION OF PREMISES

a. The Lessee acknowledges that it has inspected the premises, knows its condition, and understands that the same is leased without any representations or warranties whatsoever and without obligation on the part of the United States to make any alterations, repairs, or additions thereto.

7. RATES AND PRICES

a. The rates and prices charged by the Lessee or its sub-lessees shall be reasonable and comparable to rates charged for similar goods and services by others in the area. The District Engineer shall have the right to review such rates and prices and

require an increase or reduction when it is determined that the objective of this paragraph has been violated. The Lessee shall keep such rates and prices posted at all times in an appropriate and conspicuous place on the premises. The District Engineer may require submission of a schedule of the rates and prices at any time.

b. However, no user fees may be charged by the Lessee or its sublessees for use of facilities developed in whole or part with federal funds if a user charge by the Corps of Engineers for the facility would be prohibited under law.

8. PROTECTION OF PROPERTY

The Lessee shall be responsible for any damage that may be caused to property of the United States by the activities of the Lessee under this lease and shall exercise due diligence in the protection of all property located on the premises against fire or damage from any and all other causes. Any property of the United States damaged or destroyed by the Lessee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Lessee to the satisfaction of the District Engineer, or, at the election of the District Engineer, reimbursement may be made therefor by the grantee in an amount necessary to restore or replace the property to a condition satisfactory to the District Engineer.

9. RIGHT TO ENTER AND FLOOD

The right is reserved to the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with Government purposes; to make inspections; to remove timber or other material, except property of the Lessee; to flood the premises; to manipulate the level of the lake or pool in any manner whatsoever; and/or to make any other use of the lands as may be necessary in connection with project purposes, and the Lessee shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof.

10. INDEMNITY

The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the Lessee, or for damages to the property or injuries to the person of the Lessee's officers, agents or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Lessee

shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.

**11. INSURANCE**

a. At the commencement of this lease, the Lessee will obtain from a reputable insurance company, or companies, liability insurance. The insurance shall provide an amount not less than that which is prudent, reasonable and consistent with sound business practices or a minimum Combined Single Limit of $1,000,000.00, whichever is greater, for any number of persons or claims arising from any one incident with respect to bodily injuries or death resulting therefrom, property damage, or both, suffered or alleged to have been suffered by any person or persons, resulting from the operations of the Lessee under the terms and conditions of this lease, and the Lessee shall require its insurance company to furnish to the District Engineer a copy of the policy or policies, or, if acceptable to the District Engineer, a certificate of insurance evidencing the purchase of such insurance. The District Engineer shall have the right to review and revise the amount of minimum liability insurance coverage required. The policy shall provide that the insurance company give the District Engineer thirty (30) days written notice of any cancellation, non-renewal or change in such insurance.

b. The lessee's sublessees and licensees, at the commencement of operating under the terms of this lease, shall obtain from a reputable insurance company or companies liability insurance. The insurance shall provide an amount not less than that which is prudent, reasonable and consistent with sound business practices, for any number of persons or claims arising from any one incident with respect to bodily injuries or death resulting therefrom, property damage, or both, suffered or alleged to have been suffered by any person or persons, resulting from the operations of the sublessees and licensees under the terms of this lease. The lessee shall require any insurance carrier or carriers to furnish to the District Engineer a copy of the policy or policies, or, if acceptable to the District Engineer, certificates of insurance evidencing the purchase of such insurance.

c. The insurance policy or policies shall be of comprehensive form of contract and shall specifically provide protection appropriate for the types of facilities, services and activities involved. The Lessee shall require that the insurance company give the District Engineer thirty (30) days written notice of any cancellation or change in such insurance. The

District Engineer may require closure of any or all of the premises during any period for which the Lessee does not have the required insurance coverage.

12. RESTORATION

On or before the expiration of this lease or its termination by the Lessee, the Lessee shall vacate the premises, remove the property of the Lessee therefrom, and restore the premises to a condition satisfactory to the District Engineer. If, however, this lease is revoked, the Lessee shall vacate the premises, remove said property, and restore the premises to the aforesaid condition within such time as the District Engineer may designate. In either event, if the Lessee shall fail or neglect to remove said property and restore the premises, then, at the option of the District Engineer, said property shall either become the property of the United States without compensation therefor, or the District Engineer may cause the property to be removed and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work. The Lessee shall also pay the United States on demand any sum which may be expended by the United States after the expiration, revocation, or termination of this lease in restoring the premises.

13. NON-DISCRIMINATION

The Lessee shall not discriminate against any person or persons because of race, color, age, sex, handicap, national origin, or religion in the conduct of operations on the leased premises. The Lessee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural And Transportation Barriers Compliance Board.

14. APPLICABLE LAWS AND REGULATIONS

a. The Lessee shall comply with all applicable Federal laws and regulations and with all applicable laws, ordinances, and regulations of the state, county, and municipality wherein the premises are located, including, but not limited to, those regarding construction, health, safety, food service, water supply, sanitation, use of pesticides, and licenses or permits to do business.

b. The Lessee will provide an annual certification that all water and sanitary systems on the premises have been inspected and comply with Federal, state and local standards. Lessee will also provide a statement of compliance with the Americans with

Disabilities Act, noting any deficiencies and providing a schedule for correction.

c. In addition to other applicable codes, the lessee shall comply with the current editions of the National Fire Protection Association (NFPA) code 70, National Electric Code, ANSI/NFPA standard 303, Marinas and Boatyards, and other applicable codes and standards covering the type of facilities. Upon request by the District Engineer, the lessee will provide a certification that all electrical installations on the premises have been inspected by a qualified individual and comply with the applicable codes.

**15. TAXES**

Payment of any and all taxes imposed by the state or its political subdivisions upon the property or business of the Lessee on the premises is the responsibility of the Lessee.

**16. SUBJECT TO EASEMENTS**

This lease is subject to all existing easements, easements subsequently granted, and established access routes for roadways and utilities located, or to be located, on the premises, provided that the proposed grant of any new easement or route will be coordinated with the Lessee, and easements will not be granted which will, in the opinion of the District Engineer, interfere with developments, present or proposed, by the Lessee. The Lessee will not close any established access routes without written permission of the District Engineer.

**17. SUBJECT TO MINERAL INTERESTS**

This lease is subject to all outstanding mineral interests. As to Federally owned mineral interests, it is understood that they may be included in present or future mineral leases issued by the Bureau of Land Management (BLM), which has responsibility for mineral development on Federal lands. The Secretary will provide lease stipulations to BLM for inclusion in said mineral leases that are designed to protect the premises from activities that would interfere with the Lessee's operations or would be contrary to local laws.

18. TRANSFERS, ASSIGNMENTS, SUBLEASES

a. Without prior written approval of the District Engineer, the Lessee shall neither transfer nor assign this lease or a controlling interest therein (including, without limitation, mergers, consolidations, reorganizations, or other business

combinations), nor sublet the premises or any part thereof, nor grant any interest, privilege, or license whatsoever in connection with this lease, nor shall this lease be assignable or transferable by process or operation of law including, but not limited to, insolvency proceedings, bankruptcy, or intestacy, or in any other manner whatever.

(1) Failure to comply with this condition or the procedures described herein shall constitute a material breach of this lease for which this lease may be revoked immediately by the District Engineer, and, the Secretary shall not be obligated to recognize any right of any person or entity to an interest in this lease or to own or operate the facilities authorized hereunder acquired in violation hereof.

(2) The Lessee shall advise the person(s) or entity proposing to enter into a transaction described in Subsection a. above that the District Engineer shall be notified and that the proposed transaction is subject to review and approval by the District Engineer. The Lessee shall request in writing the District Engineer's approval of the proposed transaction and shall promptly provide the District Engineer all relevant documents related to the transaction, and the name(s) and qualifications of the person(s) or entity involved in the proposed transaction.

b. The District Engineer, in exercising discretion to approve or disapprove transfer, assignments, or subleases, shall among other matters, take into consideration the management qualifications of the individuals or entities that would thereby obtain a controlling interest in the facilities or services authorized hereunder, the experience of such individuals or entities with similar operations, and the ability of such individuals or entities to operate the operations authorized hereunder in the public interest.

c. The term "controlling interest" in a Lessee's ownership shall mean, in the instance of a corporate Lessee, an interest beneficial or otherwise, of sufficient outstanding voting securities or capital of the Lessee so as to permit exercise of substantial managerial influence over the operations of the Lessee, and, in the instance of a partnership, joint venture, or individual Lessee, any beneficial ownership of the capital assets of the Lessee sufficient to permit substantial managerial influence over the operations of the Lessee. The District Engineer will determine at the request of interested parties whether or not an interest in a lease constitutes a controlling interest within the meaning hereof.

d. The Lessee may not enter into any agreement with any entity or person, except employees of the Lessee, to exercise substantial management responsibilities for the operation authorized hereunder or any part thereof without the prior written approval of the District Engineer.

e. No mortgage shall be executed, and no bonds, shares of stock, or other evidence of interest in, or indebtedness upon the assets of the Lessee located on the premises, including this lease, shall be issued, except for the purposes of installing, enlarging, refinancing or improving concession plant, equipment and facilities, provided that, such assets, in addition, may be encumbered for the purposes of purchasing existing concession plant, equipment and facilities. In the event of default on such a mortgage, encumbrance, or such other indebtedness, or of other assignment, transfer, or encumbrance, the creditor or any assignee thereof shall succeed to the interest of the Lessee in such assets but shall not thereby acquire operating rights or privileges. Such rights or privileges shall be subject to disposition by the District Engineer.

f. The lessee may allow independent private service companies to enter and conduct business on the premises for the benefit of the Lessee's customers on an as-called basis without a formal sublease or license agreement, provided that the service is occasional and incidental to the Lessee's operation and that any compensation paid to the Lessee is included in gross receipts.

g. The Lessee will not sponsor or participate in timeshare ownership of any structures, facilities, accommodations, or personal property on the premises. The lessee will not subdivide nor develop the premises into private residential development.

19. COMPLIANCE, CLOSURE, REVOCATION AND RELINQUISHMENT

a. The Lessee and/or any sublessees or licensees are charged at all times with full knowledge of all the limitations and requirements of this lease, and the necessity for correction of deficiencies, and with compliance with reasonable requests by the District Engineer. This lease may be revoked in the event that the Lessee violates any of its terms and conditions and continues and persists in such non-compliance, or fails to obtain correction of deficiencies by sublessees or licensees. The Lessee will be notified of any non-compliance, which notice shall be in writing or shall be confirmed in writing, giving a period of time in which to correct the non-compliance. Failure to satisfactorily correct any substantial or persistent non-compliance within the specified time is grounds for closure of

all or part of the premises, temporary suspension of operation, or revocation of the lease, after notice in writing of such intent. Future requests by the Lessee to extend the lease, expand the premises, modify authorized activities, or assign the lease shall take into consideration the Lessee's past performance and compliance with the lease terms.

b. This lease may be relinquished by the Lessee by giving six months prior written notice to the District Engineer in the manner prescribed in the Condition on **NOTICES**.

c. In addition to the above right of revocation, if the rent or other payments provided to be paid by the Lessee or any part thereof shall be in arrears and unpaid for thirty (30) days after the same shall become due, then, and in such case, the District Engineer may elect to revoke this lease by notification in writing to the Lessee.

**20. HEALTH AND SAFETY**

a. The Lessee shall keep the premises in good order and in a clean, sanitary, and safe condition and shall have the primary responsibility for ensuring that any sublessees and concessionaires operate and maintain the premises in such a manner.

b. In addition to the rights of revocation for non-compliance, the District Engineer, upon discovery of any hazardous conditions on the premises that presents an immediate threat to the health and/or danger to life or property, will so notify the Lessee and will require that the affected part or all of the premises be closed to the public until such condition is corrected and the danger to the public eliminated. If the condition is not corrected within the time specified, the District Engineer will have the option to: (1) correct the hazardous conditions and collect the cost of repairs from the Lessee; or, (2) revoke the lease. The Lessee will be obligated to pay rental, notwithstanding any interruption or suspension of activities. The Lessee and its assignees or sub-lessees shall have no claim for damages against the United States, or any officer, agent, or employee thereof on account of action taken pursuant to this condition.

21. PUBLIC USE

No attempt shall be made by the Lessee, nor any of its sub-lessees or concessionaires, to forbid the full use by the public of the premises and of the water areas of the project, subject, however, to the authority and responsibility of the Lessee to

manage the premises and provide safety and security to the visiting public.

22. PROHIBITED USES

a. The Lessee shall not permit gambling on the premises or install or operate, or permit to be installed or operated thereon, any device which is illegal; or use the premises or permit them to be used for any illegal business or purpose. There shall not be conducted on or permitted upon the premises any activity which would constitute a nuisance.

b. As an exception, some games of chance, such as raffles, games and sporting events, may be conducted by nonprofit organizations under special use permits issued in conjunction with special events, if permissible by state and local law. Any request to conduct a game of chance must be submitted in writing to the District Engineer.

c. In accordance with state and local laws and regulations, the Lessee may sell, store, or dispense, or permit the sale, storage, or dispensing of beer, malt beverages, light wines or other intoxicating beverages on the premises in those facilities where such service is customarily found. Bar facilities will only be permitted if offered in connection with other approved activities. Advertising of such beverages outside of buildings is not permitted. Carry out package sales of hard liquor is prohibited.

23. NATURAL RESOURCES

The Lessee shall cut no timber, conduct no mining operations, remove no sand, gravel, or kindred substances from the ground, commit no waste of any kind, nor in any manner substantially change the contour or condition of the premises, except as may be authorized under and pursuant to the Condition on **USE AND DEVELOPMENT OF THE PREMISES** herein. The Lessee may salvage fallen or dead timber; however, no commercial use shall be made of such timber.

24. ACCOUNTS AND RECORDS

a. The Lessee shall maintain complete and accurate records and no later than 120 days following the end of the Lessee's fiscal year shall submit to the District Engineer reports and data for the preceding year to include a financial statement for the activity covered by the lease and compiled by an independent certified public accountant or by an independent licensed public accountant certified or licensed by a regulatory authority of a state.

**Westlaw Attached Printing Summary Report for TRAPP,FRANK W 353650**

| | |
|---|---|
| Date/Time of Request: | Friday, July 06, 2007 14:55:00 Central |
| Client Identifier: | 08754-0014-00254-FWT |
| Database: | MS-CS |
| Citation Text: | 657 So.2d 794 |
| Lines: | 387 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.



Purvis v. Purvis
Miss.,1994.

Supreme Court of Mississippi.
Sammy R. PURVIS
v.
Roberta E. Ramsey PURVIS.
**No. 92-KA-1063.**

March 31, 1994.
Opinion Granting Rehearing April 27, 1995.

Show cause hearing was set for alleged contemnor to show why he should not be held in **contempt** of court for unfounded allegations made against court. The Rankin County Chancery Court, Roger C. Clapp, Chancellor, found contemnor in direct **contempt** and sentenced him to 30 days in county jail and $100 fine. Contemnor appealed. The Supreme Court, Sullivan, J., held that: (1) **contempt** order was punitive in nature; (2) contemnor's conduct constituted constructive **criminal contempt** instead of direct **criminal contempt**; and (3) due process required another judge to sit at show cause hearing.

Reversed and remanded.
West Headnotes
**[1] Contempt 93 ⚷66(7)**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k66 Appeal or Error
93k66(7) k. Review. Most Cited Cases
Chancellor's classification of **contempt** as "**criminal** " is not conclusive on appeal.

**[2] Contempt 93 ⚷3**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k3 k. **Criminal Contempt**. Most Cited Cases

**Contempt 93 ⚷4**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k4 k. Civil **Contempt**. Most Cited Cases
Purpose for which court's power is exercised is determining factor in classifying **contempt** as either "civil" or "criminal."

**[3] Contempt 93 ⚷4**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k4 k. Civil **Contempt**. Most Cited Cases
If primary purpose of **contempt** order is to enforce **rights** of private party litigants or enforce compliance with court order, **contempt** is "civil **contempt**."

**[4] Contempt 93 ⚷70**

93 **Contempt**
93III Punishment
93k70 k. Nature and Grounds in General. Most Cited Cases

**Contempt 93 ⚷74**

93 **Contempt**
93III Punishment
93k73 Indemnity to Party Injured
93k74 k. In General. Most Cited Cases

**Contempt 93 ⚷81**

93 **Contempt**
93III Punishment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93k81 k. Purging **Contempt** After Adjudication. Most Cited Cases
Contemnor may be jailed or fined for civil **contempt** , however, contemnor must be relieved of penalty when he performs required act.

**[5] Contempt 93 ⚷70**

93 **Contempt**
93III Punishment
93k70 k. Nature and Grounds in General. Most Cited Cases

**Contempt 93 ⚷81**

93 **Contempt**
93III Punishment
93k81 k. Purging **Contempt** After Adjudication. Most Cited Cases
"**Criminal contempt**" penalties are designed to punish for past offenses and they do not end when contemnor has complied with court order.

**[6] Contempt 93 ⚷3**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k3 k. **Criminal Contempt**. Most Cited Cases
Conduct directed against court's dignity and authority is "**criminal contempt**."

**[7] Contempt 93 ⚷3**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k3 k. **Criminal Contempt**. Most Cited Cases
Conduct amounting to "**criminal contempt**" must be directed against court or against judge acting judicially rather than individually.

**[8] Contempt 93 ⚷3**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k3 k. **Criminal Contempt**. Most Cited Cases

**Contempt 93 ⚷72**

93 **Contempt**
93III Punishment
93k72 k. Punishment of **Contempt** as **Criminal**. Most Cited Cases
**Contempt** order which assessed contemnor fine of $100 and sentenced contemnor to thirty days in jail was punitive in nature and was, thus, "**criminal contempt**" order, in view of evidence that chancellor was seeking to punish contemnor for actions that chancellor concluded were directed against dignity of court and calculated to bring court into disrespect.

**[9] Appeal and Error 30 ⚷1009(1)**

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)3 Findings of Court
30k1009 Effect in Equitable Actions
30k1009(1) k. In General. Most Cited Cases
Normally, factual findings of chancellor are affirmed unless manifest error is present and apparent.

**[10] Contempt 93 ⚷66(7)**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k66 Appeal or Error
93k66(7) k. Review. Most Cited Cases
Supreme court is not bound by manifest error rule when appeal involves conviction of **criminal contempt**; instead, court proceeds ab initio to determine whether record proves party guilty of **contempt** beyond reasonable doubt.

**[11] Contempt 93 ⚷2**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k2 k. In General. Most Cited Cases
"Direct **contempt**" involves words spoken or actions committed in presence of court that are calculated to embarrass or prevent orderly administration of justice.

**[12] Contempt 93 ⟹52**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k51 Summary Proceedings
93k52 k. **Contempts** in Presence of Court. Most Cited Cases
Direct contemnor may be summarily punished because no evidence other than court's own knowledge is required as conduct was committed in presence of court.

**[13] Contempt 93 ⟹52**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k51 Summary Proceedings
93k52 k. **Contempts** in Presence of Court. Most Cited Cases
Direct **contempt** necessitates instantaneous response.

**[14] Contempt 93 ⟹51.1**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k51 Summary Proceedings
93k51.1 k. In General. Most Cited Cases
Contemnor's conduct constituted "constructive **criminal contempt**" instead of direct **criminal contempt**, in view of evidence that contemnor intentionally tried to obstruct orderly administration of justice through filing of motion to recuse chancellor in divorce proceedings, through telephone calls, through statements at hearing on motion for recusal, and through intentional failure to set motion.

**[15] Contempt 93 ⟹2**

93 **Contempt**
93I Acts or Conduct Constituting **Contempt** of Court
93k1 Nature and Elements of **Contempt**
93k2 k. In General. Most Cited Cases

**Contempt 93 ⟹53**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k51 Summary Proceedings
93k53 k. **Contempts** Not in Presence of Court. Most Cited Cases
"Constructive **contempt**" involves actions which are committed beyond presence of court.

**[16] Contempt 93 ⟹66(7)**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k66 Appeal or Error
93k66(7) k. Review. Most Cited Cases
Supreme Court will normally favor finding that contemnor's actions involved constructive **contempt**, rather than direct **contempt**, when there is legitimate issue as to whether contemnor has committed constructive or direct **contempt**, since constructive **contempt** requires specification of charges, notice, and hearing.

**[17] Jury 230 ⟹24.5**

230 Jury
230II **Right** to Trial by Jury
230k24.5 k. **Contempt** Proceedings. Most Cited Cases
When determining whether contemnor has **right** to jury trial, court must look to maximum sentence possible under statute, or to penalty actually imposed if no punishment is provided by statute.

**[18] Contempt 93 ⟹30**

93 **Contempt**
93II Power to Punish, and Proceedings Therefor
93k30 k. Nature and Grounds of Power. Most Cited Cases
Ability to punish for **criminal contempt** is derived from inherent powers of court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[19] Jury 230 ⟹24.5**

230 Jury
230II **Right** to Trial by Jury
230k24.5 k. **Contempt** Proceedings. Most Cited Cases
**Criminal** contemnor's sentence of thirty days imprisonment and $100 fine fell beneath threshold limit triggering **right** to jury trial on **contempt** charges.

**[20] Judges 227 ⟹49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases
Direct **contempt** may be handled by sitting judge instantly, although it is wise for judge faced with personal attacks who waits till end of proceedings to have another judge take his place.

**[21] Judges 227 ⟹49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases
It is necessary to try alleged contemnor by another judge in cases of constructive contempt where trial judge has substantial personal involvement in prosecution.

**[22] Judges 227 ⟹49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases
If course of action is aggravated by personal attacks, another judge should be asked to sit at contempt hearing.

**[23] Constitutional Law 92 ⟹4494**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)25 Other Particular Issues and Applications
92k4492 Contempt
92k4494 k. Proceedings. Most Cited Cases
(Formerly 92k273)

**Judges 227 ⟹49(1)**

227 Judges
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) k. In General. Most Cited Cases
Due process required another judge to sit at show cause hearing for contempt, where contempt complained of involved personal attacks on chancellor and his ability to perform his judicial functions. U.S.C.A. Const.Amend. 14.

Stephen L. Beach, III, Beach Luckett & Ross, Jackson, for appellant.
No brief filed for appellee.

Before PRATHER, P.J., and SULLIVAN and JAMES L. ROBERTS, Jr., JJ.

Affirmed.

SMITH, J., not participating.

EN BANC

***ON PETITION FOR REHEARING***

[Filed April 27, 1995]

SULLIVAN, Justice, for the Court:
During his divorce proceedings, Sammy Purvis filed a *pro se* motion seeking recusal of the chancellor. When Purvis failed to bring the motion on for hearing, the court did so on its own motion.
At the hearing on Sammy Purvis' motion to recuse, wherein *796 Purvis represented himself, Chancellor Clapp read each paragraph of the motion. Paragraph six in the motion for recusal stated that the chancellor did not have the "mental capacity to know right from wrong and [was] in dire need of psychiatric help." Paragraph seven

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complained that the court "has demonstrated that it does not know how to interpret the law or follow it .. ." Paragraph nine concluded that "because the chancellor has no experience in chancery law that [sic] the court system has virtually broke down with the back log of cases," and Purvis requested "that one of the Special Masters be brought in to try to restore some resemblance of justice." Upon reading the motion, the chancellor asked if Purvis had anything to add regarding each allegation. Purvis expanded on his allegations and made the remark that he had "suspicions as to what's going on " because his wife had said "she could get anything she wanted from Roger [Chancellor Clapp]." Purvis also included remarks about having provided the Attorney General's office with information which allegedly prompted an investigation of Chancellor Clapp, and having filed two complaints regarding Chancellor Clapp with the Judicial Performance Commission which would in turn require his recusal from Purvis' divorce proceeding. Finally, Purvis questioned Clapp's ability to preside over domestic matters and expressed his desire for a "veteran judge". Purvis concluded by stating, "I don't think nobody other than Jesus Christ could possibly be fair after the things we have just went over. I don't believe there's a human being that could possibly-which I'm sure this probably insulted you to some extent to be read in front of these people that you weren't with."

The chancellor declined to recuse himself from the case, instead setting a show cause hearing where Purvis would be required to show why he should not be held in contempt of court for the unfounded allegations made against the court and for having " put the Court through this process."

Purvis was represented by counsel at the subsequent show cause hearing. Purvis first brought on for hearing a motion for jury trial. Purvis asked that the chancellor clarify whether the contempt charge was civil or criminal, and repeatedly asked whether the charge was direct or constructive. The chancellor responded that the charge was one of criminal contempt, both direct and constructive. Purvis' motion for a jury trial was denied. The Chancellor also noted that a previous motion for recusal filed by Purvis had come after the Chancellor issued some rulings adverse to Purvis.

Purvis elected to put on no proof at the show cause hearing. The chancellor found Purvis in direct contempt and sentenced him to thirty days in the Rankin County jail and a $100.00 fine. The chancellor explained that after serving ten days of his sentence and payment of his fine, the remaining twenty days of jail time would be suspended so long as he refrained from making threatening phone calls to the chancellor in the future and from committing any further criminal contempt of court.

Purvis' attorney again asked for clarification as to whether Purvis' contempt was direct and constructive. The chancellor first responded that although Purvis was guilty of both types of criminal contempt, his sentence was for only direct criminal contempt. In concluding that Purvis was in direct contempt, the trial judge stated, "Purvis wrongfully attempted to, and intentionally tried to obstruct the proceedings of the court through his motion, through his telephone calls, through his statements at the hearing on the motion, [and] through his intentional ... failure to set the motion." The court entered an order finding Purvis in **contempt** of court, and it is from this order that Purvis appeals to this Court.

[1][2][3][4][5] The chancellor's classification of the **contempt** as **criminal** is not conclusive on appeal. *In re Stewart*, 571 F.2d 958, 963 (5th Cir.1978). The purpose for which the court's power is exercised is a determining factor in classifying **contempt** as either civil or criminal. *Common Cause of Mississippi v. Smith*, 548 So.2d 412, 415 (Miss.1989). If the primary purpose is to enforce the **rights** of private party litigants or to enforce compliance with a court order, the **contempt** is civil. *Id.* One may be jailed or fined for civil **contempt**, however, the contemnor must be *797 relieved of the penalty when he performs the required act. *Hinds County Bd. of Supervisors v. Common Cause of Mississippi*, 551 So.2d 107, 120 (Miss.1989). **Criminal contempt** penalties are designed to punish for past offenses and they do not end when the contemnor has complied with the court order. *Smith*, 548 So.2d at 415-16.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[6][7] Conduct directed against the court's dignity and authority is criminal contempt. *Lawson v. State,* 573 So.2d 684, 686 (Miss.1990). It involves an act "which tends to bring the court into disrepute or disrespect." *Lawson,* 573 So.2d at 686 (quoting *Cook v. State,* 483 So.2d 371, 374 (Miss.1986). Conduct amounting to criminal contempt must be directed against the court or against a judge acting judicially rather than individually. *Culpepper v. State,* 516 So.2d 485, 486 (Miss.1987).

[8] The purpose of the chancellor in assessing a fine of $100.00 and a sentence of thirty days in the County jail was punitive in nature. The chancellor was seeking to punish Purvis for actions that the chancellor concluded were directed against the dignity of the court and calculated to bring the court into disrespect. The penalty was designed to punish Purvis for past disobedience instead of for the purpose of coercing some different course of conduct. The penalty imposed under these circumstances could have only been the result of a charge of criminal contempt.

[9][10] Normally, the factual findings of the chancellor are affirmed unless manifest error is present and apparent. *Caldwell v. Caldwell,* 579 So.2d 543, 545 (Miss.1991). This Court is not bound by the manifest error rule when the appeal involves a conviction of criminal contempt. Instead, this Court proceeds *ab initio* to determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt. *Lamar v. State,* 607 So.2d 129, 130 (Miss.1992); *Premeaux v. Smith,* 569 So.2d 681, 683-84 (Miss.1990); *see* Miss.Code Ann. § 11-51-11 (Supp.1994) (general statute pertaining to contempt appeals). However, it is not necessary to review the record to see if Purvis was guilty beyond a reasonable doubt since this case requires reversal on other procedural grounds.

[11][12][13] Purvis first contends that the trial judge improperly classified his conduct as direct criminal contempt instead of constructive contempt. Direct contempt involves words spoken or actions committed in the presence of the court that are calculated to embarrass or prevent the orderly administration of justice. *Varvaris v. State,* 512 So.2d 886, 887 (Miss.1987). The direct contemnor may be summarily punished because no evidence other than the court's own knowledge is required as the conduct was committed in the presence of the court. *Lamar,* 607 So.2d at 130. Direct contempt necessitates an instantaneous response. *Varvaris,* 512 So.2d at 888. Thus, the distinction between direct and constructive contempt is important in determining the necessary procedural prerequisites to finding an individual in contempt.

[14][15] While the Chancellor in the case *sub judice* stated that Purvis was being punished only for his direct criminal contempt, the basis and substance of the court's ruling was founded on constructive criminal contempt. The Chancellor explained that Purvis intentionally tried to obstruct the orderly administration of justice through the filing of a motion to recuse the Chancellor in Purvis' divorce proceeding, through telephone calls, through statements at the hearing on the motion for recusal, and through the intentional failure to set the motion. Constructive contempt involves actions which are committed beyond the presence of the court. *Coleman v. State,* 482 So.2d 221, 222 (Miss.1986); *see, e.g., Wood v. State,* 227 So.2d 288 (Miss.1969) (concluding that contemptuous language found within pleading filed in pending matter was constructive rather than direct contempt). The court in issuing its decision made reference to a single activity committed in the presence of the court, Purvis' language in the courtroom as he personally argued his motion for recusal. Otherwise, Purvis' actions were committed outside the presence of the court. The court expressly concluded that Purvis was guilty of constructive **criminal contempt** in addition to direct **criminal contempt**. The suspension of twenty days of ***798** his sentence was based upon Purvis' promise not to engage in other acts classified as constructive **contempt**. The essence of the trial court's ruling was founded on constructive **criminal contempt** regardless of what acts the Chancellor said were attributed with the penalty imposed.

[16] This Court will normally favor finding that the contemnor's actions involved constructive **contempt** when there is a legitimate issue as to whether the contemnor has committed constructive or direct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**contempt** since constructive **contempt** requires a specification of charges, notice and a hearing. *Wood,* 227 So.2d at 290. Although Purvis was properly afforded the procedural mandates of a constructive **contempt** charge, he argues that he was entitled to a trial by jury.

[17][18] When determining whether a contemnor has the **right** to a jury trial, the court must look to the maximum sentence possible under the statute, or to the penalty actually imposed if no punishment is provided by statute. *McGowan v. State,* 258 So.2d 801, 802 (Miss.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 430, 34 L.Ed.2d 298 (1972). Contrary to Purvis' argument that Miss.Code Ann. § 99-19-31 sets the potential penalty for constructive contempt at $1,000.00 entitling him to a jury trial, this Court has determined that this statute is not applicable since the ability to punish for criminal contempt is derived from the inherent powers of the court. *Melvin v. State,* 210 Miss. 132, 148, 48 So.2d 856 (Miss.1950). Therefore, the actual penalty imposed by the trial court must be the focus.

[19] Purvis received a fine of one hundred dollars ($100.00) and thirty days imprisonment. The maximum penalty allowed by this Court without a jury trial has been six months imprisonment and five hundred dollars ($500.00). *McGowan,* 258 So.2d at 803. Since Purvis' sentence fell beneath the threshold limit triggering the right to a jury trial, the trial court did not err in denying Purvis' request for a trial by jury on his contempt charge.

Finally, Purvis argues that he was denied due process of law because the show cause proceeding was conducted by the same judge who presided over the divorce proceedings and the related motion for recusal from which the alleged contempt originated. The contempt complained of in the case at hand clearly involved personal attacks on Clapp and his ability to perform his judicial functions. Purvis was clearly within his rights to file a motion to recuse the chancellor, but his motion clearly involved matters personal in nature. Purvis questioned the judge's personal ability to do his job, and accused him of colluding with Purvis' wife in the divorce proceeding. In *Varvaris,* this Court determined that the judge was not personally involved in the contempt proceedings since the conduct involved a personal attack on the district attorney during the proceedings. *Varvaris,* 512 So.2d at 888. *Varvaris* can be easily distinguished on these facts alone since the conduct in the case *sub judice* was clearly directed at Chancellor Clapp. The language used by Purvis to make these pointed remarks was anything but gentle or kind to the Chancellor.

[20][21][22][23] Direct contempt may be handled by the sitting judge instantly, although it is wise for a judge faced with personal attacks who waits till the end of the proceedings to have another judge take his place. *Mayberry v. Pennsylvania,* 400 U.S. 455, 463-64, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971). Not only did the judge in the instant case wait till a subsequent date to deal with the alleged contempt complained of during the motion for recusal, the judge based his decision on additional acts which occurred outside of his presence. It is necessary to try the individual by another judge in cases of constructive contempt where the trial judge has substantial personal involvement in the prosecution. *Varvaris,* 512 So.2d at 888. Where a course of action is aggravated by personal attacks, another judge should be asked to sit at the contempt hearing. *Mayberry,* 400 U.S. at 464, 91 S.Ct. at 504 . Although not every attack on a judge disqualifies him from sitting, common sense leads to the conclusion that it was unlikely that the chancellor in Purvis' case maintained the detachment necessary for making an unbiased and fair decision. Furthermore, there can be no argument that it would have been impractical to ***799** have designated a different judge to sit at the contempt hearing as the contempt charge was set and heard at a later date.

Purvis was charged with a course of conduct that was committed, for the most part, outside the presence of the court. His conduct associated with the divorce proceedings involved the judge personally, and the judge chose to set a show cause hearing for contempt charges at a date subsequent to the alleged contemptuous conduct. Accordingly, due process required that another judge sit at the show cause hearing for contempt. For these reasons, the judgment below should be reversed and remanded.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**REVERSED AND REMANDED.**

HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.
SMITH, J., not participating.
Miss.,1994.
Purvis v. Purvis
657 So.2d 794

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

b. The District Engineer shall have the right at any time (1) to verify all financial reports and copy the books, correspondence, memoranda, income tax returns and other records of the Lessee and sublessees, if any, and of the records of proprietary or affiliated companies, if any, related to this lease during the period of the lease (This right shall extend for such time thereafter as may be necessary to accomplish such verification, but in no event more than five (5) years after the close of the business year of the Lessee); (2) to require the Lessee to furnish an audited financial statement; or (3) to require the Lessee to furnish an audited statement of gross receipts for the concession operation, including the gross income of any sublease operation, and certification of the accuracy of the reported income.

c. Statements will be prepared by an independent certified public accountant or by a licensed public accountant certified or licensed by a regulatory authority of a state. Audits will be in accordance with the auditing standards and procedures promulgated by the American Institute of Certified Public Accountants. Financial statements requiring audits and accompanied by remarks such as "prepared from client records without audit" are unacceptable. Audited and reviewed financial statements shall contain appropriate footnotes. The independent licensed or certified public accountant shall include a statement to the effect that the amounts included in the financial report are consistent with those included in the Federal tax returns. If the amounts are not consistent, then a statement showing differences shall be included. An audit of Lessees tax returns is not required.

**25. ENVIRONMENTAL PROTECTION**

a. Within the limits of their respective legal powers, the parties to this lease shall protect the project against pollution of its air, ground, and water. The Lessee shall comply promptly with any laws, regulations, conditions or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous materials within the premises is specifically prohibited. Such regulations, conditions, or instructions in effect or prescribed by the Environmental Protection Agency, or any Federal, state, interstate or local governmental agency, are hereby made a condition of this lease. The Lessee shall require all sanitation facilities on boats moored at the Lessee's facilities, including rental boats, to be sealed against any discharge into the lake. Services for waste disposal, including

sewage pump-out of watercraft, shall be provided by the Lessee as appropriate. The Lessee shall not discharge waste or effluent from the property in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b. The Lessee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Lessee's activities, the Lessee shall be liable to restore the damaged resources.

c. The lessee must obtain approval in writing from the District Engineer before any pesticides or herbicides are applied to the premises.

## 26. PRELIMINARY ASSESSMENT SCREENING

A Preliminary Assessment Screening (PAS) documenting the known history of the property with regard to the storage, release or disposal of hazardous substances thereon, is attached hereto and made a part hereof as Exhibit C. Upon expiration, revocation or termination of this lease, another PAS shall be prepared which will document the environmental condition of the property at that time. A comparison of the two assessments will assist the District Engineer in determining any environmental restoration requirements. Any such requirements will be completed by the lessee in accordance with the condition on **RESTORATION.**

## 27. HISTORIC PRESERVATION

The Lessee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archaeological, architectural or other cultural artifacts, relics, remains, or objects of antiquity. In the event such items are discovered on the premises, the Lessee shall immediately notify the District Engineer and protect the site and the material from further disturbance until the District Engineer gives clearance to proceed.

## 28. SOIL AND WATER CONSERVATION

The Lessee shall maintain, in a manner satisfactory to the District Engineer, all soil and water conservation structures that may be in existence upon said premises at the beginning of, or that may be constructed by the Lessee during the term of, this lease, and the Lessee shall take appropriate measures to prevent or control soil erosion within the premises. Any soil erosion occurring outside the premises resulting from the activities of

the Lessee shall be corrected as directed by the District Engineer.

29. LIGHTS, SIGNALS AND NAVIGATION

There shall be no unreasonable interference with navigation by the exercise of the privileges granted by this lease. If the display of lights and signals on any work hereby authorized is not otherwise provided for by law, such lights and signals as may be prescribed by the Coast Guard or by the District Engineer shall be installed and maintained by and at the expense of the Lessee.

30. HUNTING AND TRAPPING

The Lessee shall not hunt or trap or allow hunting or trapping on the premises.

31. TRANSIENT USE

a. Camping, including transient trailers or recreational vehicles, at one or more campsites for a period longer than thirty (30) days during any sixty (60) consecutive day period is prohibited. The Lessee will maintain a ledger and reservation system for the use of any such campsites, said system to be acceptable to the District Engineer.

b. Occupying any lands, buildings, vessels or other facilities within the premises for the purpose of maintaining a full- or part-time residence is prohibited, except for employees, residing on the premises, for security purposes, if authorized by the District Engineer.

32. DISPUTES CLAUSE

a. Except as provided in the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act), all disputes arising under or relating to this lease shall be resolved under this clause and the provisions of the Act.

b. "Claim," as used in this clause, means a written demand or written assertion by the Lessee seeking, as a matter of right, the payment of money in a sum certain, the adjustment of interpretation of lease terms, or other relief arising under or relating to this lease. A claim arising under this lease, unlike a claim relating to that lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the Lessee. However, a written demand or written assertion by the Lessee seeking the payment of money exceeding $50,000 is not a

claim under the Act until certified as required by subparagraph c.(2) below. The routine request for rental payment that is not in dispute is not a claim under the Act. The request may be converted to a claim under the Act, by this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

c. (1) A claim by the Lessee shall be made in writing and submitted to the District Engineer for a written decision. A claim by the Government against the Lessee shall be subject to a written decision by the District Engineer.

(2) For Lessee claims exceeding $50,000, the Lessee shall submit with the claim a certification that:

(i) The claim is made in good faith;

(ii) Supporting data are accurate and complete to the best of the Lessee's knowledge and belief; and

(iii) The amount requested accurately reflects the lease adjustment for which the Lessee believes the Government is liable.

(3) If the Lessee is an individual, the certificate shall be executed by that individual. If the Lessee is not an individual, the certification shall be executed by:

(i) A senior company official in charge at the Lessee's location involved; or

(ii) An officer or general partner of the Lessee having overall responsibility of the conduct of the Lessee's affairs.

d. For Lessee claims of $50,000 or less, the District Engineer must, if requested in writing by the Lessee, render a decision within 60 days of the request. For Lessee-certified claims over $50,000, the District Engineer must, within 60 days, decide the claim or notify the Lessee of the date by which the decision will be made.

e. The District Engineer's decision shall be final unless the Lessee appeals or files a suit as provided in the Act.

f. At the time a claim by the Lessee is submitted to the District Engineer or a claim by the Government is presented to the Lessee, the parties, by mutual consent, may agree to use alternative means of dispute resolution. When using alternate

dispute resolution procedures, any claim, regardless of amount, shall be accompanied by the certification described in paragraph c.(2) of this clause, and executed in accordance with paragraph c.(3) of this clause.

g. The Government shall pay interest on the amount found due and unpaid by the Government from (1) the date the District Engineer received the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury, as provided in the Act, which is applicable to the period during which the District Engineer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim. Rental amounts due to the Government by the Lessee will have interest and penalties as set out in the Condition on **CONSIDERATION.**

h. The Lessee shall proceed diligently with performance of the lease, pending final resolution of any request for relief, claim, appeal, or action arising under the lease, and comply with any decision of the District Engineer.

## 33. COVENANT AGAINST CONTINGENT FEES

The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this lease without liability or, in its discretion, to require the Lessee to pay, in addition to the lease rental or consideration, the full amount of such commission, percentage, brokerage, or contingent fee.

## 34. OFFICIALS NOT TO BENEFIT

No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this lease or to any benefits to arise therefrom. However, nothing herein contained shall be construed to extend to any incorporated company if the lease be for the general benefit of such corporation or company.

## 35. SEVERAL LESSEES

If more than one Lessee is named in this lease the obligations of said Lessees herein contained shall be joint and several obligations.

DACW38-1-96-46

**36. MODIFICATIONS**

This lease contains the entire agreement between the parties hereto, and no modification of this agreement, or waiver, or consent hereunder shall be valid unless the same be in writing, signed by the parties to be bound or by a duly authorized representative; and this provision shall apply to this clause as well as all other conditions of this lease.

**37. DISCLAIMER**

This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the grantee shall obtain such permission as may be required on account of any other existing rights. It is understood that the granting of this lease does not eliminate the necessity of obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat. 1151; 33 U.S.C. § 403), or Section 404 of the Clean Water Act (33 U.S.C. § 1344).

***IN WITNESS WHEREOF*** I have hereunto set my hand by authority/direction of the Secretary of the Army this 19th day of December, 1995.

BURKE S. TORREY
Chief, Real Estate Division

**THIS LEASE** is also executed by the Lessee this 14 day of DEC., 1995.

**BASS MANAGEMENT, INC.**

BENTON N. BASS, President

## CORPORATE CERTIFICATE

I Vicky Bass certify that I am the Secretary of Bass Management, Inc., that Benton N. Bass, who signed the foregoing instrument on behalf of the corporation was then President of the corporation. I further certify that the said officer was acting within the scope of powers delegated to this officer by the governing body of the corporation in executing said instrument.

Certified this 14 day of Dec, 1995.

Bass Management, Inc.

Vicky Bass

Secretary - Treasurer
Bass Management, Inc.

# PARCEL 1

A tract or parcel of land lying and being situated in the NE¼ of Section 8, the NW¼ of Section 9, and the SE¼ SE¼ SE¼ of Section 5, Township 2 South, Range 21 West, Garland County, Arkansas, and being more particularly described as follows:

Beginning at a point from which the NE corner of the SE¼ NE¼ of Section 8, Township 2 South, Range 21 West, bears north 700 feet, more or less;

Thence S 57°45′ W, 970 feet, more or less, to the 578-foot contour, NGVD;

Thence along the 578-foot contour, NGVD, in a northerly direction 1,850 feet,, more or less, to a point;

Thence leaving said 578-foot contour, N 06°30′ E, 220 feet, more or less, to a ½" metal rebar stake;

Thence N 67°30′ W, 209 feet, more or less, to a ½" metal rebar stake;

Thence N 02°30′ E, 94 feet, more or less, to a ½" metal rebar stake;

Thence S 77°′30′ E, 162 feet, more or less, to a ½" metal rebar stake;

Thence N 19°30′ E, 58 feet, more or less, to a nail set in the asphalt on the south edge of a road;

Thence along the south edge of said road S 60°30′ E, 66 feet to a point;

Thence from a point on the south side of the road to a point on the north side of the road 20 feet, more or less;

Thence N 33° W, along the east side of said road 220 feet, more or less, to a point;

Thence N 57° E, 30 feet, more or less, to a point;

Thence N 33° W, 60 feet, more or less, to a point;

Thence S 57° W, 30 feet, more or less, to a point;

Thence N 33° W along the east side of said road, 175 feet, more or less, to a point;

Thence along the centerline of a drain northeasterly 220 feet, more or less, to a point, having an elevation of 578 feet, NGVD;

Thence along the 578-foot contour, NGVD, northeasterly and southeasterly 5,175 feet, more or less, to a point;

Thence N 6° E, 350 feet across a cove, to a point having an elevation of 578 feet, NGVD;

Thence along the 578-foot contour, NGVD, southerly and westerly 2,150 feet to a point;

Thence S 57°45′ W, 890 feet, more or less, to a point of beginning, containing 54.64 acres, more or less.

## PARCEL 2

A tract or parcel of land lying and being situated in the NE¼ of Section 8, the NW¼ of Section 9, and the S½ SW¼ of Section 4, Township 2 South, Range 21 West, Garland County, Arkansas, and being more particularly described as follows:

Begin at a point from which the NE corner of the SE¼ NE¼ of said Section 8 bears north 700 feet, said point being on the existing boundary lease limits of the Brady Mountain Resort and the point of beginning for the tract herein described;

Thence from said point of beginning along said existing boundary lease limits, N 57°45' E, 890 feet, more or less to a point on a contour having an elevation of 578 feet National Geodetic Vertical Datum (N.G.V.D.);

Thence along the meanders of said contour in a generally easterly then northerly direction, 2,150 feet to a point;

Thence leaving said existing boundary lease limits continuing along said contour in a general, northeasterly direction, 3,210 feet, more or less to a point being 470 feet northerly of the south boundary line of said Section 4 and being 1,310 feet, westerly of the east line of the SW¼ of said Section 4;

Thence leaving said contour, parallel with said south boundary line, easterly, 980 feet, more or less to a point being 330 feet westerly of said east line of the SW¼;

Thence parallel with said east line of the SW¼, southerly 2,710 feet, more or less, to a point being 330 feet northerly of the southline of the NW¼ of said Section 9;

Thence parallel with said south line of NW¼, westerly 2,860 feet, more or less, to a point on said existing boundary lease limits;

Thence along said existing boundary lease limits N 57° 45' E, 560 feet more or less to the point of beginning, containing 120 acres, more or less.

# PARCEL 3

A tract or parcel of land lying and being situated in the SW¼ of Section 4, Township 2 South, Range 21 West, Garland County, Arkansas, and being more particularly described as follows;

Begin at a point being 330 feet westerly of the west line of said SW¼ and 470 feet northerly of the south line of said SW¼;

Thence from said point of beginning, parallel with said south line westerly, 980 feet, more or less, to a point on a contour having an elevation of 578 feet National Geodetic Vertical Datum (N.G.V.D.);

Thence along the meanders of said contour in a generally northerly, southeasterly then northeasterly direction 3100 feet, more or less, to a point being 330 feet westerly of said west line of the SW¼;

Thence leaving said contour, parallel with said west line of the SW¼ southerly, 640 feet, more or less, to the point of beginning, containing 17 acres more or less.

It is understood and agreed to by Lessee that Parcel No. 3 is subject to the completion of a cultural resource survey, environmental assessment and supplement to the master plan being approved by the Corps of Engineers'. It is further understood and agreed to by the Lessee that there will be no construction or activity of any kind conducted on Parcel No. 3 until the above requirements have been fulfilled and the Lessee notified in writing by the District Engineer.


PARCEL 2


PARCEL 2

## Preliminary Assessment Screening (PAS)

**Project Title:** Leasing of 191.64 Acres of Fee Land at Lake Ouachita, Arkansas, for Commercial Concession Purposes

**Anticipated Date of the Proposed Action:** FY 96

It has been determined, in accordance with regulations issued by the Environmental Protection Agency at 40 CFR Part 373, that there is no evidence to indicate that hazardous substance activity took place on the property during the time the property was owned by the United States.

BURKE S. TORREY
Chief, Real Estate Division